GULF, COLORADO & SANTA FE RAILWAY COMPANY v.
MAGGIE MATTHEWS ET AL.

Decided March 25, 1903.

**1.—Contributory Negligence—Lying on Railroad Track.**

A person lying down on a railroad track where trains are liable to pass at any moment, whether drunk or sober, is guilty of contributory negligence as a matter of law.

**2.—Same—Fact Case.**

See evidence held to show, over a verdict to. the contrary, that deceased, when struck and killed by a train, was lying on the track, and not walking along on it.

**3.—Same—Practice on Appeal—Reversal and Remand.**

Where on appeal in an action for negligently causing death the judgment is reversed because the deceased was guilty of contributory negligence as matter of law, judgment will not be rendered for the defendant if there is any other theory arising from the pleadings and evidence upon which the defendant could be held liable, but the case will be remanded.

Error from the District Court of Grayson. Tried below before Hon. Rice Maxey.

*J. W. Terry* and *Cowan, Burney & Lee,* for plaintiff in error.

*Wolfe, Hare & Semple,* for defendants in error.

NEILL, ASSOCIATE JUSTICE.—This suit was brought by Maggie Matthews as the surviving wife of J. L. Matthews, deceased, for herself and as next friend of Katie May Matthews and Beulah Marie Matthews, his minor children, against the plaintiff in error, to recover damages for its alleged negligent killing of the deceased.

The substance of plaintiffs' petition is, that on the 8th day of May, 1899, J. L. Matthews, while walking along on plaintiff in error's railroad track, where it was commonly used by the public with the knowledge, consent and acquiescence of the company, within the corporate limits of the city of Fort Worth, was, by the negligence of the railroad company's servants operating one of its freight trains, in running such train within the city limits at a rate of speed greatly in excess of that prescribed by an ordinance of said city, in negligently failing to keep a lookout for persons on its track, and in negligently failing to ring the bell of the engine, knocked down, run over and killed by said train, to plaintiffs' damage in the sum of $50,000.

The defendant railway company answered by a general denial and plea of contributory negligence, as well as by several other special pleas which, in view of the disposition we shall make of the case, are not necessary to state here.

The case was tried before a jury, and the trial resulted in a judgment for $14,000 against the company, from which it has appealed.

*Opinion.*—The plaintiff in error presents in its brief of 170 pages

sixty-one assignments of error, each of which is urged as a reason for the reversal of the judgment. These assignments are answered by defendants in error by a brief of eighty-seven pages, in which it is contended that none of them furnish any grounds for disturbing the judgment. In response, plaintiff in error has filed in this court a supplemental brief of thirty pages.

While we have read with interest all these briefs, and considered carefully each assignment of error presented, the conclusion we have reached in determining this appeal renders it necessary for us to consider only those assignments which relate to the question of deceased's contributory negligence. It is to this question that our statement and discussion of the evidence will be mainly directed.

J. L. Matthews owned teams and a grading outfit with which, up to a few days before May 7, 1899, he had been working for the Santa Fe Railroad near Heidenheimer, which teams and outfit had been carried from there to Cleburne, Texas. On that day Matthews left Cleburne on the afternoon train for Fort Worth, telling his employe before leaving that he was going there to get work,—which he expected to procure either from the Texas & Pacific Railway Company or at a gravel pit in the last named city, at the same time instructing his employe to carry his teams and grading outfit overland to Fort Worth, promising to meet him there on the next day at 3 p. m. at a watering trough on lower Main Street, and that he would in the meantime find and provide in or near Fort Worth a camping place for his teams and outfit. Matthews arrived in Fort Worth that evening, accompanied by a companion, T. W. Turner, who left him at a hotel on Main Street, about 10 o'clock that night, with the understanding that they should meet at 7 o'clock next morning on Front Street, and would together look out for a camping place. Before Turner left him, according to his testimony, Matthews had taken two drinks of whisky, and was slightly under the influence of the beverage. Turner also heard Matthews speak to the hotel clerk about procuring a bed. The clerk at the hotel testified that Matthews told him he wanted a bed, but did not care to go to sleep right then; that he was going away, but would be back in about an hour and occupy the room. The room was shown him by the clerk, and Matthews then left, it being somewhere between 10 and 1 o'clock. He was never afterwards seen alive by anyone who recognized him. He did not return to the hotel, and it is not shown from the evidence where he went from there, or where he spent the remainder of the night. The clerk testified that when he came to the house to get a bed he was intoxicated to such an extent that he would stagger as he walked, and that it was easy to see that he was drinking a good deal.

The length of plaintiff in error's road lying within the corporate limits of Fort Worth is about three miles, its general direction being north and south. Old Cemetery is situated within the city limits on the west side of the road about a mile and a half north of the depot, and from the center of the city. From the northeast corner of the ceme-

tery, where the railroad crosses the north boundary line of the city, is 865 feet. Bridge 210 of the road is 435 feet north from Peach Street. Bridge 211 is 475 feet north of bridge 210, and bridge 211 is 270 feet from 210. A curve in the road begins near bridge 210, and ends some distance north of the cemetery, near bridge 212. From the north side of Peach Street extending north to Trinity River, probably more than a mile, the road is built upon an embankment, which between bridges 210 and 211 is fifteen feet high, and is down grade. The stock yards are about three miles north of Fort Worth. North of and near Old Cemetery were grounds that had been used for campers for a long time. An ordinance of the city of Fort Worth makes it a penal offense to run a train anywhere within the city limits at a greater rate of speed than six miles per hour.

On the 8th day of May, 1899, at 6 o'clock a. m., a freight train, loaded with cattle, of plaintiff in error, left its depot at Fort Worth with orders to meet another train at the stock yards at 6:15 that morning, and en route, while running at a speed of twenty-five or thirty miles an hour, ran over an object which the engineer and fireman say was lying near the north end of Old Cemetery. The train never stopped nor slacked its speed until it reached the stock yards. Then, upon examining the wheels and appliances of the cars, blood, particles of flesh and parts of viscera, which were thought to be of a human being, were found. Early that morning a witness, John Woods, who lives with his mother near the railroad north of the cemetery, in going down to the business part of the city, while walking down the railway track, met a freight train, loaded with cattle, going north, and stepped aside to let it pass. He then resumed his journey, and after proceeding about 100 yards from the point where the train passed him, came upon the body of a dead man, lying on the track between bridges 210 and 211, which is admitted was that of J. L. Matthews. It was badly mangled, the top of the skull being mashed off, the brain exposed, legs cut and broken in several places, the abdomen torn open and viscera exposed and lacerated, both feet severed and hanging merely by the skin, and nearly all of the clothing torn off, and the body was warm, bleeding profusely and the flesh quivering. It is evident that this body was the object seen by the engineer and fireman and run over by plaintiff in error's freight train that left its depot at 6 o'clock that morning.

For the purpose of eliminating the case of every question except that of contributory negligence on the part of deceased, it will be conceded that the railroad track along where Matthews was run over was constantly used, with the knowledge and acquiescence of the company, as a pathway by pedestrians; that the company was negligent in running its train in the city limits at a speed greatly in excess of six miles an hour, that its servants negligently failed to ring the bell of the engine, and that such negligence of the company contributed to Matthews' death. This leaves us to consider and determine from the evidence the bare question as to whether deceased was guilty of contributory negli-

gence. This is primarily a question of fact for the jury, and except in cases where the plaintiff's own evidence raises a presumption of such negligence, the burden of proof is on the defendant. And a court will not disturb the verdict of a jury, unless from all the evidence it so clearly and palpably appears that he was guilty of contributory negligence that men of ordinary minds could form no other conclusion.

If Matthews was lying down on plaintiff in error's railroad track—whether drunk or sober, asleep or awake—at the time he was struck and run over, it can not be denied that he was guilty of negligence proximately contributing to his death. It is not alleged nor contended that he was discovered in such an attitude by the operators of the engine in time for them to prevent the train from running over him; nor that, if the speed of the train had not been greater than six miles an hour, it would have been possible, after seeing the object on the track, to stop the engine before reaching the place where it was lying.

The defendants in error base their case solely upon the theory that deceased was walking along the track in front of the engine when he was struck by the train, and that he was not negligent in being there. Therefore, if he was lying down on the track, or if his walking along it in front of the train was negligence, they are not entitled to recover. This raises the questions: (1) Does the evidence show that deceased was lying on the track when struck? (2) If not, was he walking in front of the engine, and if he were, was it negligence?

The undisputed evidence shows that a fog enveloped the city of Fort Worth at the time of the accident so dense that it prevented anyone from seeing an object along the railroad track further than seventy-five feet from him.

H. E. Bemis, the engineer of the train, testified: "I remember running over an object at north end of Old Cemetery in Fort Worth, May 8, 1899, that I was told afterwards was a man. I was pulling seventeen cars of stock, including caboose. Left Fort Worth going north about 6 o'clock a. m. It was an exceptionally foggy morning, as bad as we ever have on the Trinity River. I had an order to meet a train at stock yards, three miles north of Fort Worth. The train had rights over our train—had the right to go to Fort Worth if I didn't arrive at 6:15, and on account of the dense fog it was necessary that I should be there. We couldn't see each other if we came together, so I was in considerable hurry so they wouldn't meet on the main line, and passing this point I could see this object on the main track; and not seeing any stock on there, it impressed me it might be a man—that it was something besides stock—and as I came over it—it was done in a flash almost—I concluded it must be human. We were going about twenty-five miles an hour, I should think. I saw an object right close to cemetery. On account of it being foggy, I couldn't see far. It couldn't have been over fifty feet, I think, ahead of the engine, about seventy-five feet from me. It was about twenty-five feet from where I sat in cab to front of engine. The headlight was burning that morning. The headlight is no help to a man

on the engine seeing ahead of the engine in a fog, but you can see the headlight in a fog further than you can see a train. As I went along the track I was looking ahead all I was capable of doing to tell whether anything was on the track. It was my business to watch ahead all the time, and under these circumstances I was more anxious than if it was clear. I blew the whistle shortly before we passed around corner of cemetery, and the bell was ringing. I blew the whistle to give warning to those beyond the curve that the train was coming. The track curves to the left there. As I went over this object on the track I could not tell what it was. The object might have been seventy-five feet ahead of the engine, but not further than that. You couldn't see it distinctly over thirty feet. As to the best impression I have now as to how it looked, we couldn't tell whether it was a hog lying there or a dog, or it might have been some kind of an old coat, it was a dark object; there was nothing to discern it or tell what it was, lying there quietly as we passed over it. We struck the object just a few minutes after 6 o'clock that morning. I did not see a man walking on the track that morning. I would have seen him if I had come close to him, seventy-five feet, something like that, I could have seen him. After I saw the object on the track I could not by the use of my appliances at hand, or all of them, have stopped the train before it ran over the object."

A. R. Woodward, the fireman on the engine, testified: "I remember the accident in question. I was fireman on the engine. I don't remember the exact hour we left Fort Worth, about daylight, I guess. When we passed Old Cemetery that morning, and as we were going along the side of the cemetery, going north, I should judge we were running twenty to twenty-five miles an hour. We were increasing speed when we passed the cemetery. It was down grade. We ran over something in the neighborhood of the north end of the cemetery. I was sitting on the seat-box ringing the bell and looking ahead, and as we rounded the curve north of the cemetery a short distance, I saw an object on the track. It was just about daylight and a foggy morning, and we were right on it before I saw the object; I couldn't have seen it very far, of course. The first thought was to look, and I looked the best I could, and I looked to the engineer and says, 'What is that?' and he says, 'I don't know; that's what I would like to know.' I says, 'Believe it is a human form,' and he says, 'It might be a hog or dog or something like that.' The object was not over sixty-five, seventy or eighty feet from us when I saw it. When this conversation occurred between the engineer and myself, the engine was right on the object. There was a very heavy fog that morning."

These two witnesses were the only ones to the accident. From where the evidence shows the body of the deceased was found and where it indicates he was first struck by the engine, it is clear that the object they testified to seeing on the track was his body, and it is equally clear that he was not walking or standing, but was lying on the track when he was struck by the engine. While there is some evidence of conflict-

ing statements made by Bemis, nothing was ever said by him that would tend in the least to discredit his testimony we have quoted. To our minds, it is consistent with all the other testimony in the case that would tend to throw any light upon the question under consideration. A number of locomotive engineers—expert, it seems, in striking, killing and wounding human beings walking or standing on railroad tracks with their engine pilots—testified that a man standing or walking on a railroad track, if struck by an engine running at a speed of twenty-five miles an hour, would not go under the train, but would be knocked off the track, if he did not fall back on the front end of the engine; and in that event he would fall from the side of the pilot off the track.

It was held upon a prior appeal of this case that the question of whether a train, striking a man standing or walking on a railroad track, would throw him off or run over him, is one peculiarly within the knowledge of locomotive engineers and other persons familiar with such accidents, and therefore a proper subject of expert testimony. 28 Texas Civ. App., 92, 66 S. W. Rep., 588, 4 Texas Ct. Rep., 152. If, then, we add such expert testimony to that of Bemis and Woodward, and then consider in connection with it the testimony of the hotel clerk to the effect that Matthews was so drunk that he staggered, and in that condition left the hotel the night before the accident, without returning to the room he engaged, the conclusion is irresistible that he was lying down on the track when he was struck and run over by the train. There is no use in citing authorities to demonstrate that it is contributory negligence for one to lie down on a railroad track over which trains may be run at any moment. If this be not contributory negligence, negligence of such character has disappeared from our system of jurisprudence.

Of course if deceased was lying down upon the track when the engine struck him, he was neither standing nor walking, and the conclusion that he was lying there renders it unnecessary for us to consider the matter further. But it is contended by defendants in error, that there is evidence sufficient to warrant a jury, in spite of the testimony to the contrary, in finding that Matthews was walking along the track in front of the engine and that he was struck, knocked down and run over by the train. If this were conceded, the burden would not be upon plaintiff in error to prove that in walking along the track in front of an approaching train deceased was guilty of contributory negligence; for in that event defendants in error's own evidence would render it necessary that they should explain the conduct of the deceased to exculpate him from contributory negligence. Gulf C. & S. F. Ry. Co. v. Hill, 95 Texas, 629, 69 S. W. Rep., 136; Railway Co. v. Reed, 88 Texas, 447, 31 S. W. Rep., 1058. No explanation tending to exculpate him from such negligence is shown.

Here is the testimony upon which defendants in error rely to show that deceased was walking along the track:

W. C. Prince testified: "My house is situated about thirty-five yards

west of the track. I had seen one train pass that morning going north. I noticed two persons walking on the track that morning going north. I do not know who they were. They were about sixty or seventy yards apart. I saw them before the train passed and before the discovery of the dead body. I do not know just when the dead body was discovered, but I saw the men going along the track five or ten minutes before the train passed. I do not undertake to say that I believe one of the men I saw walking along the track was the one that was killed. It is my opinion that such is a fact from the resemblance of the dead man in form and clothes to the second man I saw going along the track. The first man I saw go by on the railroad that morning was carrying under his arm what seemed to be a small bundle. The second man had in his right hand what appeared to me to be a very small grip. I was about thirty-five yards from the parties, sitting in my kitchen eating breakfast, when I saw them pass. The first man I saw looked like a laboring man, and had on blue ducking pants and a jumper. The second man had on a light colored suit."

Clide Baptist testified: "I was living at the section house, Peach Street, Fort Worth, which house is about fifty feet west of defendant's track, and about one-fourth of a mile south of where the body was found. On that morning I saw a man walking up the Santa Fe track, north. I did not know him. He was about 5 feet six inches high, medium build, and wore a dark suit of clothes, slouched hat; don't know the color; think it was brown. I saw a stock train pass over the track going north. The man passed along the track about five minutes before the stock train did. He was walking very brisk when he passed the section house; he was walking a little over an ordinary walk, about like a business man would to and from his business. He carried something on his right side, but it being on the opposite side from me I could not tell whether it was a valise or a bundle. He was about fifty feet from me. I found one-half of a vest something near a mile from the point where the body was found, north of said body. It was at the end of the ties on the west side of defendant's track, near a small bridge; don't know how far from the bridge; I think about 150 feet north. The piece of goods found appeared to be about same quality of goods worn by the dead man when found. This piece of goods found, in my judgment, was same quality of goods the man was wearing who passed the section house going north. I didn't notice any blood on the piece found."

The deceased was 5 feet 6 inches high. And a witness testified: "He was especially quick and active in his manner and style of walking, and I think anyone would notice it. It was materially different from any other person. I could identify Matthews by his walk, independent of anything else." Another witness testified: "It was materially different from other persons I know. I think I cold identify Matthews by his walk, independent of anything else."

The wife of deceased testified that when he left home, about two

months prior to his death, among the clothing he carried away with him in his trunk were a brown suit and a black one and a black hat and a drab one; that when the trunk was received after his death, it had in it the dark suit, the dark brown pants and the black hat, but that she never received back the brown coat and vest like the brown pants; that the pair of pants she received was still lighter than the coat and vest she didn't get back, and that she has never seen the drab hat since he left home.

This is the testimony upon which defendants in error rely to show that Matthews was walking on the track when he was struck by the engine.

Can it, with any degree of certainty, be deduced from it that one of the men seen by Prince or the one seen by Baptist was the man who was killed by the train? If it should be said one of them was, can it be said which one—the first one or the second one seen by Prince, or the one seen by the other witness? For the one seen by Baptist may or may not have been one of the two seen by the other witness. Of the men seen on the track, there is nothing to show that one was more likely to be caught and run over by the train than the other; each certainly would have been had he not got off the track. All did leave the track, if one of them was not Matthews. Prince gives it as his opinion, from the resemblance to the dead man and his clothes, that the second man he saw on the track was the deceased. This man, according to his testimony, had on a light suit of clothes and was carrying in his right hand what the witness took to be a small grip. If this description is correct, he could not have been the man seen by Baptist, for his man had on a dark suit of clothes; nor could the man seen by Baptist have been the first man seen by Prince, for that man had on "blue ducking pants and a jumper." There is no testimony tending to show with any degree of certainty how Matthews was dressed; his clothing, with the exception of an undershirt wrapped and twisted about his shoulder, was torn from him, and, unless the piece of vest picked up by Baptist was his, not a particle of it was ever found and identified as clothing worn by him. Neither Turner nor Salisbury, the only witness who testified to seeing him in Fort Worth the night before his death, said anything about how he was dressed. Nor did Turner, whom deceased parted with in Cleburne in the afternoon before that night. There is no testimony that deceased had a grip. No grip, bundle or particles or contents of either was picked up or discovered near the scenes of the accident or along the railway track. The testimony of Baptist as to the height of the man he saw on the track, when the distance he was from him and the fog is considered, can at best be taken only as a mere guess. That the man he saw was walking, about as a business man would be going to and from his business, did not tend to prove the "unusual, distinctive characteristic walk" of Matthews. Nor is the evidence that Matthews had a brown suit of clothes when he left home, the coat and vest of which was not returned to his wife with his trunk, taken by itself or in

connection with all or in connection with any other part of the testimony, of any value upon the question as to whether deceased was walking on the track when he was struck by the engine. It is only from such inferences that may be conjured up from this testimony—arising one from the other in a perfect fog of doubt—that it can be conjectured Matthews was standing or walking on the track when struck by the train. To prove the principal fact, it is not permissible to go into the domain of conjecture and pile one presumption upon another. "As the very foundation of indirect evidence is the establishment of one or more facts from which the inference is sought to be made, the law requires that the latter should be established by direct evidence, as if it were the very fact in issue." United States v. Ross, 92 U. S., 284; Gillett, Ind. and Collat. Ev., sec. 52; Railway Co. v. Porter, 73 Texas, 305; Railway Co. v. Kizziah, 86 Texas, 88. Evidence incapable of affording any reasonable presumption or inference as to the principal matter in dispute, is no evidence at all. Kellogg v. McCabe, 92 Texas, 201.

We conclude from all the evidence that the deceased was lying on the track when struck, and in doing so was guilty of contributory negligence as a matter of law. Railway Co. v. Shiflet, 94 Texas, 131; Railway Co. v. McDonald, 52 S. W. Rep., 650; Railway Co. v. Ryan, 80 Texas, 89. The court erred in not peremptorily instructing the jury to find for the defendant, for which error the judgment of the District Court is reversed and the cause remanded.

*Reversed and remanded.*

## ON MOTION TO REFORM JUDGMENT.

By this motion we are asked to render judgment in favor of plaintiff in error, instead of remanding the cause to the District Court for another trial. On the theory upon which the case was tried in the court below, we held that deceased was guilty of contributory negligence as a matter of law in lying upon plaintiff in error's railroad track when he was struck and killed by its engine. Under this holding, if there were no other theory arising from the pleadings and evidence upon which appellant could be held liable for the damages for Matthews' death, it would have been our duty to have reversed the judgment of the court below and rendered judgment here for plaintiff in error, notwithstanding the fact that in its brief we were not asked to render judgment in its favor, but simply to reverse the judgment appealed from and remand the cause for another trial. But from a careful consideration of defendant in error's pleadings, and the evidence in the case, we concluded that another theory might probably be deduced upon which plaintiff in error might be held liable, and for that reason, after reversing the judgment appealed from, we remanded the cause for another trial, instead of rendering judgment in favor of plaintiff in error. In doing so we believe we made the proper disposition of the cause. Therefore the motion is overruled.

*Overruled.*