### KIRBY LUMBER CO. v. BOYETT et al.
(No. 518.)

(Court of Civil Appeals of Texas. Beaumont. April 19, 1920. Rehearing Denied May 5, 1920.)

1. **Railroads 〰381(3)—Lying on track contributory negligence.**

One lying down on a railroad track is guilty of contributory negligence as a matter of law, unless his presence is accounted for and explained.

2. **Railroads 〰382(6)—Lying down on track by reason of disease not contributory negligence.**

One lying down on a railroad track by reason of disease, mental or physical, is not guilty of contributory negligence.

3. **Railroads 〰398(4)—Finding of no contributory negligence in lying on track unwarranted.**

In an action for the death of one lying on a railroad track, evidence *held* insufficient to sustain a finding that he was not guilty of contributory negligence.

4. **Evidence 〰596(1)—Juries not permitted to render verdicts upon mere possibilities.**

Juries are not permitted to render verdicts on mere possibilities, surmises, or suspicions.

5. **Appeal and error 〰1175(5)—Judgment on reversal rendered, where stronger case could not be made on new trial.**

Where it is manifest, on appeal in an action for wrongful death, that the case has been fully developed by able counsel, and there is no reasonable expectation that a stronger case could be made by plaintiff on another trial, judgment will be rendered for defendant, where a judgment in favor of plaintiff is reversed, because not sustained by evidence.

Appeal from District Court, Liberty County; J. L. Manry, Judge.

---

〰For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Action by Mrs. M. F. Boyett and others against the Kirby Lumber Company. Judgment for plaintiffs, and defendant appeals. Reversed and rendered.

Andrews, Streetman, Logue & Mobley, of Houston, for appellant.

E. B. Pickett, Jr., C. H. Cain, and P. C. Matthews, all of Liberty, for appellees.

HIGHTOWER, C. J. Mrs. M. F. Boyett, surviving widow of J. W. Boyett, deceased, for herself, and also on behalf of four minor children of herself and said J. W. Boyett, filed this suit in the district court of Liberty county against the Kirby Lumber Company to recover damages because of the death of said J. W. Boyett, alleged to have been caused by negligence on the part of said defendant. The plaintiff recovered judgment, and defendant has appealed. We find in appellant's brief a concise, but sufficient, statement of the contentions of the parties, which is accepted by appellee as being correct and sufficient, and we adopt it:

"In so far as this appeal is concerned, the material allegations of the plaintiffs' petition may be stated succinctly as follows:

"(a) That the deceased, J. W. Boyett, was at the time when he met his death walking in an easterly direction upon and along the tram railway of the defendant, Kirby Lumber Company, in the village of Lyric.

"(b) That that part of said tram track was customarily and habitually used as a pathway by employés of the Kirby Lumber Company, both when on and off duty, and by the public generally, and that the said J. W. Boyett was at the time making use of such pathway in pursuance of the consent and permission of the Kirby Lumber Company expressly and impliedly given to employés when on and off duty, and to the public generally, to make use of that portion of said tram track for a pathway.

"(c) That, while the said J. W. Boyett was so making use of said pathway, an engine of the defendant company, coming in a westerly direction over said track, ran into and over the said J. W. Boyett, and killed him.

"(d) That the death of said J. W. Boyett proximately resulted from negligence upon the part of the defendant, Kirby Lumber Company, its servants, agents, and employés, in that the said engine was then and there being carelessly and negligently operated, without having any headlight thereon, it being then after dark, and without having a proper and reasonable lookout, and without taking any other proper and reasonable precautions to discover persons who might be in a position of peril upon or about said tram at that point, and that the death of said J. W. Boyett was due to and proximately caused by the negligent failure of the defendant, its agents and employés, to have a proper headlight upon said engine, and to keep a reasonable lookout for and to exercise ordinary care to discover that the said J. W. Boyett was in a position of peril.

"(e) That the said J. W. Boyett had been employed by the Kirby Lumber Company as hardwood foreman, and had been at work in that position during the day on which he was killed, but that, some time before he was struck by said engine and killed, his day's labors had ended, and he was not on duty at the time said engine struck and killed him, and was not then engaged in the performance of his duties as an employé of the defendant, and that he was not killed in the course of his employment.

"The answer of the defendant Kirby Lumber Company, in so far as is material to be here stated, consisted of a general demurrer, a general denial, and plea of contributory negligence; it being alleged by the defendant that the said J. W. Boyett, at the time when he sustained injuries which resulted in his death, was guilty of negligence which contributed to cause his death, in that he was then and there lying upon the tram track of defendant, and was then and there in a state of intoxication, or was asleep upon said track, or, in any event, was lying upon the said track, and was unnecessarily there, with no reason for his being there, and on his way to no place at which he was required to be, and whether in an intoxicated condition, or unintoxicated, was guilty of negligence in being upon said track, and that, if he was walking upon said track, he could easily have seen and known and heard the engine which ran over and killed him as it was coming over said track, and he could just as easily and readily have walked on the side of the track, out of danger, as on the track between the rails where he was, and could have seen and known and heard the engine approaching, and could easily have gotten out of the way thereof, and that in being upon the said track under the circumstances, and in not removing himself out of the way of danger from the engine running over said track, he was guilty of negligence which contributed to bring about the injuries which resulted in his death."

The case was tried with a jury, and was submitted upon special issues, in answer to which the jury found:

(1) That the defendant was guilty of negligence in running and operating the engine which killed Boyett, without having any headlight thereon.

(2) That such negligence on defendant's part was a proximate cause of Boyett's death.

(3) That Boyett was not guilty of contributory negligence.

(4) That at the time Boyett was killed he was not intoxicated.

(5) That just prior to and at the time when Boyett was run over and killed by the engine he was lying down on the defendant's tram track.

(6) That Boyett, by the exercise of ordinary care, could not have avoided being run over by defendant's tram engine.

(7) That $15,000 would be a reasonable and fair compensation to plaintiffs as damages because of the death of said Boyett, and that Mrs. Boyett ought to have $7,000 of this amount, and the remainder should be equally divided between the four minor children.

Appellant, Kirby Lumber Company, is a corporation engaged in the manufacture and sale of lumber, and on the 8th day of Febru-

ary, 1918, owned and operated a sawmill situated on its tram railway track in Liberty county about nine miles south of the town of Cleveland. Around this mill lived quite a number of appellant's employés, working in different capacities, and most of them lived with their families in houses built upon premises belonging to appellant, but some of them boarded and lived in a boarding house on the premises. The deceased, J. W. Boyett, was in the employ of appellant as hardwood log scaler, or foreman and log scaler, and he performed his duties under his employment out in the woods on appellant's tram track, some six or seven miles south of where the mill, boarding house, commissary, and dwelling houses were located; that is, at Lyric. This little village, Lyric, is generally referred to as the "Kirby Camp," and will so be referred to hereinafter. The woods where Boyett performed his duties was commonly referred to and designated as the "front," and we will use that term hereinafter. For the purpose of hauling logs from the "front" to the mill, and for the purpose of transporting its employés from the camp to the "front," appellant owned and operated upon its tram railway track several railroad steam engines, one of which would always be attached to one or more cabooses, which were used for the exclusive purpose of carrying the employés, deceased among them, from the camp to the "front" every morning, and then bringing them back from the "front" to the camp every evening. This engine and caboose would usually leave the Kirby camp about 6 o'clock each morning, and would usually return about 7 or 7:30 o'clock in the evening. On the morning of February 8, 1918, J. W. Boyett left his home at the Kirby camp and went out on this engine, which was operated by J. Lee Smiley as engineer, to perform his duties as log scaler for appellant at the "front," and after his day's work was completed he returned on the same engine to the Kirby camp that evening, reaching there about the usual time, just about dusk. When this engine, on which Boyett was riding, arrived at the usual stopping place that evening near the commissary at the camp, it was there stopped, and the engineer, Lee Smiley, got off the engine and tried to prevail upon Boyett to get off; but Boyett did not do so at that time, but instead remained on the engine, and a few moments later Smiley, who had stepped aside to get a drink of water, again returned to the engine, and again tried to arouse Boyett and get him off the engine, and at that time Boyett made an effort as if to get up from his seat, but did not do so, and Smiley thereupon went away and left him on the engine. The place where the engine stopped, and where Boyett should have gotten off, and where he usually got off, was a short distance from the house in which Boyett lived, and while we cannot ascertain from the state of the record the exact distance, it was undisputed that it required only three or four minutes to walk from the usual stopping place to Boyett's house.

The engine and caboose which brought Boyett from the "front" back to the camp on the evening of the accident left the "front" about 6 o'clock and about five minutes later another engine, operated by Engineer J. F. Holt and pulling a train load of logs, also left the "front," following Smiley's engine, on which Boyett was riding, to the Kirby camp, but was behind Smiley's engine some 25 or 30 minutes in reaching the camp. When Holt's engine got within about 600 or 700 yards from the commissary at the camp, it stopped at a switch stand or Y, making off from the main track for the purpose of doing some switching, and after proceeding with this switching, which it is unnecessary to mention in detail, again started up the main track in the direction of the commissary where Smiley's engine had stopped, and after proceeding about 40 or 50 feet, and while going at a speed of between 8 and 10 miles an hour, the brakeman on the engine, who was riding on the running board in front of the engine with a lantern in his hand, discovered an object lying between the rails on the main track, and immediately sprang from the engine and halloaed to Engineer Holt, who immediately reversed his engine and made every effort to stop it, but before he could do so it ran over the body of J. W. Boyett and killed him. Boyett, according to the undisputed evidence, was lying down on the main track between the rails with his arm across one of the rails and his head resting on his arm, at the time he was run over. It was quite dark at the time, and the engine was in 20 feet of his body before it was discovered by Charlie Bass, who was the brakeman on the running board, and at that time the brakeman could only tell that it was an object of some sort; but the engine was within 10 feet of the body before the brakeman was able to recognize that the object on the track was a man. It was too late, after Boyett's body was first discovered on the track, to prevent the engine's running over him, by the use of any means or efforts then at hand.

Appellant's first assignment of error complains of the refusal of the trial court to peremptorily instruct a verdict in its favor; it being contended by appellant under this assignment that J. W. Boyett was guilty of contributory negligence as a matter of law, and that such negligence barred any recovery in this case. Under this assignment, we find the following propositions:

"It was error for the trial court to refuse to charge the jury to return a verdict in favor of the defendant, for the reason that the undisputed evidence showed that, just prior to and at the time when deceased, J. W. Boyett, was run over by the defendant's tram engine, he

was lying down on the defendant's tram track, and hence that he was guilty of contributory negligence as a matter of law."

"It was error for the trial court to refuse to instruct the jury to return a verdict in favor of the defendant, for the reason that the undisputed evidence showed that, just prior to and at the time when the deceased J. W. Boyett was run over by the defendant's tram engine, he was lying down on the defendant's tram track, and no explanation, excuse, or justifying circumstance for his presence upon said track in such condition was offered by the evidence, other than the fact that he was probably then and there intoxicated, and he was therefore, under the evidence, guilty of contributory negligence as a matter of law."

"It was error for the trial court to refuse to charge the jury to return their verdict in favor of defendant, for the reason that under the undisputed evidence the deceased, J. W. Boyett, just prior to and at the time when he was run over by the defendant's engine, was lying down on the defendant's tram track, the said J. W. Boyett was, as a matter of law, prima facie guilty of contributory negligence, and the evidence failing to disclose any justifying or excusing fact or circumstance for his presence on said track in such condition, and there being in any event no more than a mere surmise or suspicion of any such excuse or justifying circumstance, the defendant was entitled to a peremptory instruction in its favor."

We shall assume, and we hold, that the evidence as shown by the record in this case was sufficient to warrant the jury's finding that appellant was guilty of negligence in operating the engine in question without a headlight, and also that such negligence was a proximate cause of Boyett's death, and also that the amount awarded the appellees was justified by the evidence, and that the judgment should be affirmed, unless appellant's plea of contributory negligence should be sustained; in other words, unless the undisputed evidence in this case showed that J. W. Boyett was guilty of contributory negligence as a matter of law. This conclusion obviates any necessity of discussing any of the evidence relative to appellant's negligence.

The material evidence relative to the plea of contributory negligence interposed by appellant was substantially as follows:

W. M. Cunningham, a witness for the appellees, lived at Cleveland, about 9 miles from Lyric, the Kirby camp. He had a contract with the Kirby Lumber Company as log sawyer, and for his use and convenience kept a tent out at the "front" on the company's tram, where Boyett also performed his duties as log scaler. On the evening before the accident to Boyett, Cunningham went from Cleveland to Humble, and there got five quarts and one pint of whisky, and returned to Cleveland about 10 o'clock that night, and then went out to the camp at Lyric, taking the whisky with him. Not all of this whisky was for Cunningham himself, but four quarts of it was for other persons at the camp, to whom Cunningham delivered it. Cunningham left the camp at Lyric next morning on one of the log trains at the usual time, and got out to the "front," where his tent was, about 7 o'clock, and had with him at that time his quart of whisky, but the pint he and others drank the night before. When Cunningham reached his tent he found J. W. Boyett there, and they each took a drink of whisky. Boyett then left the tent in pursuit of his duties, and about 10 o'clock returned to the tent, and he and Cunningham each took another drink, and then Boyett started to scale some logs for Cunningham, but about that time appellant's superintendent, W. A. Hodges, came up, and Boyett went somewhere with Hodges, and Cunningham did not see Boyett again until about 11:30 or 12 o'clock, when Boyett and Hodges returned to the tent, and then Boyett took another drink and Hodges took one. From that time until about 4 o'clock p. m., Cunningham and Boyett were together scaling logs, but they got through about 4 o'clock and returned to the tent, and then each took another drink. This made four drinks that Cunningham had seen Boyett take during the day, and, if he had any more, Cunningham did not know it. Cunningham did not observe that the whisky had affected Boyett, and stated that Boyett did his work in his usual way. He also stated, however, that Boyett was feeling drowsy about 4 o'clock, when the last drink was taken, and that after this Boyett went to sleep on a bed in the tent, and slept until his train was about ready to go in, at which time Cunningham aroused him, and he got up and left the tent, walking to the engine on the track, and got on it. Cunningham observed Boyett as he proceeded from the tent to the engine, and testified that Boyett was not staggering at all, but walked as he usually did. A few minutes later the engine Boyett was on started, and Cunningham never saw him again. It was further shown by Cunningham that he had a great deal of experience in drinking whisky, and had worked in a saloon as long as 9 years, and he stated that an ordinary drinker could take as many as four or five drinks in the course of 8 or 10 hours without being materially affected.

Lon Oliver testified that he was at the "front" on the day of the accident, having been employed the day before by the Kirby Lumber Company as night watchman at the "front," and that about 5:30 in the evening he saw Boyett, while the latter was going from Cunningham's tent to get on the train that was to take him back to the camp, and that Boyett was then staggering along like a drunk man; that he saw Boyett get on the engine, and that he sat down on the fireman's seat; that witness went to the engine to speak to Boyett about some stovepipe that he wanted sent out from the commissary;

that at first Boyett paid no attention to witness, but sat there with his head down; that witness again spoke to Boyett, who then raised his head and said to witness, "I don't give a damn about you." This witness further stated that he had not seen Boyett drink any whisky that day; that he did not see Boyett while he was asleep in Cunningham's tent, and did not smell any whisky on his breath; that he could not swear that Boyett was not sick at the time he got on the engine.

J. L. Smiley, who was the engineer on the engine that brought Boyett from the "front" back to the camp on the evening of the accident, testified that the engine left the "front" about 6 o'clock; that witness did not see Boyett at the time he got on the engine, witness not being on the engine just at the time, but was attending to other duties; that when witness came back to the engine to start in to the camp, he saw Boyett, who was sitting on the fireman's seat; that Boyett did not talk to witness at all while on the way in, but remained on the fireman's seat with his legs crossed all the way; that witness could not swear whether or not Boyett was drunk, but he acted like drunk men witness had observed before, but also looked like he was suffering; that Boyett did not groan or complain in any manner of pain or any character of sickness while on the way in, but most of the time leaned against the cab with the side of his head resting in his hand; that Boyett had ridden on the engine many times before, and usually did talk to witness; that most of the time on the way in Boyett's eyes were closed, but that at times they were open and looked "wild"; that when the engine reached the camp that evening it was not dark, but was about dusk, and the engine stopped at the usual place near the water plug, not far from the commissary; that witness made an effort to get Boyett off the engine, saying to Boyett, "We are at the camp, let's go and eat our supper," but Boyett made no effort to move, but sat there "cross-legged"; that witness stepped aside a few minutes to get a drink of water, and again returned to the engine, and then said to Boyett, "Come on, let's go eat our supper," to which Boyett then replied, "All right, Lee," and seemed to make an effort to get up, but did not do so. Witness then left the engine, and went by the commissary, and told Mr. Hodges, appellant's superintendent, that Boyett was on the engine, and witness could not get him off, and that Boyett was "either drunk as a boiled owl, or sick, or something bad the matter with him." Witness then went on home, and between 10 and 20 minutes later he heard the alarm whistle of the engine that ran over and killed Boyett. Witness did not see Boyett leave the engine, and could not say when he did so.

The witness John Vinson testified that on the day of the accident he was out at the "front," where Boyett was engaged, and that he saw Boyett out there about 9:30 in the morning, and at that time Boyett appeared to be "at himself" in every respect; that he did not see Boyett drink any whisky, but was not with Boyett any more that day; that witness came back to the camp at Lyric that night on the log train pulled by engine No. 12, which was the engine that killed Boyett; that when this train reached the switch or Y, some 600 or 700 yards south of the commissary, the train was stopped to do some switching, and witness got off and proceeded north along the main track on his way to his home, somewhere up near the commissary; that about 150 yards north of where Boyett's body was afterwards found witness met Boyett on the track going south and back towards the woods or "front," and that it was very dark at the time, and that Boyett's shoulder bumped into witness' shoulder, or their shoulders bumped together, and that thereupon Boyett said, "Where in the hell are you going?" and "sort of staggered" off to one side; that witness could not say positively that Boyett was drinking or not, but it was his opinion that Boyett was drinking "a little." The witness further stated that it was not uncommon for men around the sawmill to curse, and that Boyett's remark, "Where in the hell are you going?" did not cause witness any concern, or create in his mind any suspicion that anything was wrong with Boyett; that witness went on up the track and to his home, and that, in about 20 minutes after passing Boyett, witness heard the alarm whistle of the engine that killed him.

The witness M. C. Kelly testified that on the day of the accident he was sawing logs at the "front," and saw Boyett out there three times on that day, first about 11 o'clock, next time about 12 o'clock, and again about 5 o'clock; that he saw Boyett take only one drink of whisky, which was at noon; that he did not see Boyett while asleep in Cunningham's tent, but saw him sitting on the side of the bed after he woke up, and at that time talked with Boyett, and Boyett seemed "all right"; that he saw Boyett as he walked from the tent to the engine before the same started back to the camp, and that Boyett was not staggering, but walked and acted as usual; that each time witness saw Boyett during the day he observed nothing unusual or out of the ordinary about him.

The witness W. A. Hodges testified that he was at the "front" on the day of the accident, and saw Boyett there about 10 o'clock, and was with Boyett from that time until 11:30; that Boyett performed his duties as scaler in his usual manner up to the time witness left him, and seemed to be in his usual condition of body and mind; that witness saw Boyett take only one drink of whisky, which was about 11:30, the time at which they separated. Witness then returned to the commissary at the camp, and did not see Boyett alive again that day. This witness further stated that after Engineer Smiley

221 S.W.—43

had told witness that night about Boyett's condition, as shown in Smiley's testimony above, witness left the commissary and went to Boyett's house to see if Boyett had come home, and that when he got there a physician and several women were there in attendance upon Mrs. Boyett, who was sick; that, upon finding that Boyett was not at home, witness and the doctor and a Mr. Martin, who was also present, decided that someone should go to find Boyett, and that when found he should be carried to the boarding house for the night, and not be permitted to go to his home that night under the circumstances; that Martin then agreed to go to find Boyett, and was in the act of starting, when the alarm whistle was sounded on the engine that ran over Boyett; that this whistle was sounded about 30 or 40 minutes after the engine on which Boyett came back from the "front" had arrived.

Mrs. Boyett testified that on the morning of the accident her husband left home at the usual time to go to his work at the "front," and that when he left he was well and hearty; that he had no whisky at home at that time, and did not take any with him to his place of work on that day that she knew of; that her husband was a regular drinker, that is to say, accustomed to drinking, but hardly ever drank so much that he did not know what he was doing; that they had been married about 15 years, and that Mr. Boyett was 43 years of age and a healthy and able-bodied man; that usually Mr. Boyett's train would get back home every evening about 7 or 7:30 o'clock, and Mr. Boyett would go immediately home; that she heard the whistle of the engine that Mr. Boyett came in on that night, and also heard the alarm whistle of the engine that killed him, and that the whistles were about 40 or 45 minutes apart; that Mr. Boyett had no duties of any character to perform for his employer after his train would come back in the evening, but all his work was done in the woods at the "front."

There was no attempt made on the part of the appellee on the trial below to explain why it was that J. W. Boyett had gone back down appellant's track some 500 yards in the direction from which he had come on the engine, and the evidence is wholly undisputed that he had no business of any kind to carry him back to the point where he was killed, after getting off of the engine on which he had come, and nothing in this record, either fact or circumstance, suggests any reason for his action in doing so, unless it be that he was under the influence of liquor.

[1] As above stated, it was undisputed that, at the time he was killed, Boyett was lying down between the rails on appellant's main track, a place of inherent danger, and unless his presence there in that manner was accounted for and explained by the evidence in such way as to acquit him of contributory negligence, he was guilty of such as a matter of law. It is argued in the brief for appellees that the evidence as a whole was sufficient to warrant the jury in concluding that Boyett must have been overcome by some character of attack, over which he had no control and for which he was not responsible, that rendered him unconscious, and that he fell down or lay down on the track while in such unconscious state of mind, and that, if such was the fact, Boyett was not guilty of contributory negligence as a matter of law. We do not understand counsel for appellee to contend that, if Boyett was guilty of contributory negligence, a recovery could have been had in this case; but the contention is that that issue, from the whole evidence, was one for the determination of the jury.

[2-4] We are not unmindful of the rule, well established in this state, that where the evidence in a case of this character is sufficient to sustain a finding that a person lying down on a railroad track at the time injured did so by reason of some cause like a fit or other character of disease, mental or physical, over which he had no control, and for which he was not responsible, liability for his injury or death would not be defeated by the rule of contributory negligence; but certainly, before recovery could be had under such circumstances, it would have to be shown, by evidence sufficient on that point, that the person upon the track was overcome by some disease or attack, mental or physical, over which he had no control, and for which he was not responsible, and that such attack rendered him incapable of appreciating the danger to which he was exposed. Now, the vital question for determination in this case is whether the evidence in this record was such as to justify any such finding, and we have concluded, after careful consideration of the entire evidence, that it is not sufficient to justify such finding. It may be, as found by the jury, that Mr. Boyett was not intoxicated at the time of his death, and it is unnecessary for us to determine whether such finding can be sustained; but we do conclude—in fact, we cannot escape the conclusion—that the only reasonable theory that could be advanced for his presence on appellant's track at the time of his death is that he was so far under the influence of liquor that he was not conscious of what he was doing when he lay down on appellant's track, or, if he was, that he did so, appreciating the danger to which he was exposed. There is not a word of testimony in the whole record indicating that the deceased was subject to attacks of any character, mental or physical, that might account for and excuse his presence on appellant's track at the time he was killed. On the contrary, the undisputed evidence of Mrs. Boyett is to the effect that the deceased was a stout and able-bodied man, and enjoyed perfect health, mentally and physically, and about the only particle of testimony in the entire record that could pos-

sibly be seized upon as a circumstance to indicate that the deceased was even sick in any respect was the evidence of the witness Smiley to the effect that deceased at times while riding in on the engine looked like a man that was suffering. At the same time Smiley testified that deceased made no complaint of any sickness whatsoever; that he did not even as much as groan or make any exclamations of any character of suffering, either while on the engine on the way in or after the engine had arrived at the camp, or while Smiley was trying to get deceased to leave the engine. It seems to us that it would be most remarkable to conclude that deceased was suffering from some disease or attack that would render him unconscious, when he made no complaint of that nature to anyone. Of course, it may be possible that such was the case; but juries are not permitted to render verdicts upon mere possibilities or surmises or suspicions. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.

It is not a pleasant duty to be compelled to hold in this case that the appellees, the unfortunate widow and minor children of the deceased, cannot recover against appellant any damages because of the death of the husband and father, and it is only because of our bounden duty that we do so. We are forced to the conclusion that the deceased, J. W. Boyett, was guilty of contributory negligence as a matter of law, as contended by appellant, and that the trial court, for that reason, erred in refusing to give appellant's peremptory instruction, and that the first assignment of error, challenging that action, must be sustained. We shall not attempt to discuss the many authorities bearing upon the point, but feel certain that the conclusion we have reached is sustained by practically every decision emanating from the appellate courts of this state on facts such as are shown in this record. M., K. & T. Ry. Co. v. Malone, 102 Tex. 273, 115 S. W. 1158; T. & P. Ry. Co. v. Breadow, 90 Tex. 26, 36 S. W. 410; H. & T. C. Ry. Co. v. Smith, 52 Tex. 183; T & N. O. R. Co. v. McDonald, 99 Tex. 207, 88 S. W. 201; G., H. & S. A. Ry. Co. v. Ryon, 80 Tex. 60, 15 S. W. 588; G., C. & S. F. Ry. Co. v. Matthews, 32 Tex. Civ. App. 137, 73 S. W. 415, 74 S. W. 803; G., C. & S. F. Ry. Co. v. Matthews, 100 Tex. 63, 93 S. W. 1068; Smith v. I. & G. N. Ry. Co., 34 Tex. Civ. App. 209, 78 S. W. 556; Caldwell v. H. & T. C. Ry. Co., 54 Tex. Civ. App. 399, 117 S. W. 490; Roper v. Texas Central Ry. Co., 55 Tex. Civ. App. 620, 119 S. W. 696; Moore v. G., C. & S. F. Ry. Co., 58 Tex. Civ. App. 118, 123 S. W. 1143; Railway Co. v. West, 174 S. W. 287; Massey v. Railway Co., 162 S. W. 371; Devance v. Railway Co., 164 S. W. 13; Smith v. Fordyce (Sup.) 18 S. W. 663.

[5] From the record before us, it is manifest that the case has been very fully developed by able counsel who tried it, and that there is no reasonable expectation that a stronger case could be made by appellees upon another trial, and therefore the judgment of the trial court will be reversed, and here rendered in favor of appellant; and it is so ordered.