### WACO DRUG CO. v. HENSLEY et al.
### No. 1401–5585.

Commission of Appeals of Texas, Section A.

Feb. 4, 1931.

Spell, Naman & Penland, of Waco, for plaintiff in error.

A. K. Doss, of Abilene, and Bean & Klett, of Lubbock, for defendants in error.

SHARP, J.

Duncan Hensley filed this suit in the district court of Lubbock county, Tex., against E. I. Hall, M. A. Halsey, S. M. J. Benson, J. H. Benson, and the Waco Drug Company. He alleged that the defendants, E. I. Hall, M. A. Halsey, S. M. J. Benson, J. H. Benson, and the Waco Drug Company, acting by G. H. Penland, its attorney, and C. M. Penland, its secretary, conspired together to defraud the plaintiff, Duncan Hensley, of $10,000, and pursuant to such conspiracy, made fraudulent representations and fraudulently concealed certain facts with reference to the affairs of the Halsey Hall Drug Company and sought recovery of said sum on account of the said conspiracy and fraud. Upon the trial of the case plaintiff dismissed his suit as against the defendant J. H. Benson. E. I. Hall appeared in person and by written waiver of service, but did not contest plaintiff's cause of action, and judgment was therefore rendered by the court in favor of the plaintiff against E. I. Hall for the sum of $10,000. On motion of the remaining defendants, the trial court gave the jury a peremptory instruction to return a verdict in their favor and against the plaintiff, and, accordingly, judgment was entered dismissing the suit as against the defendant J. H. Benson, granting the plaintiff recovery against the defendant E. I. Hall, for the sum sued for and denying the plaintiff any judgment as against the remaining defendants, S. M. J. Benson, M. A. Halsey, and the Waco Drug Company. The plaintiff, Duncan Hensley, appealed from this judgment, assigning as error the trial court's action in giving the jury a peremptory instruction to return a verdict in favor of the Waco Drug Company, but not assigning any error as to the court's action in giving a peremptory instruction as to the remaining defendants. The Court of Civil Appeals reversed and remanded the cause. We refer to the opinion of the Court of Civil Appeals for more detailed statement of the nature and result of this suit. 18 S.W.(2d) 778. A writ of error has been granted.

The Waco Drug Company contends that the Court of Civil Appeals erred in not overruling the assignment of error of the plaintiff, Duncan Hensley, for the reason that there is no evidence whatsoever of any misrepresentation, concealment, fraud, or conspiracy on the part of the Waco Drug Company or any of its agents nor any circumstance from which such fraud, misrepresentation, concealment, or conspiracy could be inferred.

The sole question presented for our determination is whether or not the evidence was of sufficient probative force to require the submission of the case to the jury.

The following facts are undisputed: The firm of Halsey Hall Drug Company was a copartnership composed of M. A. Halsey and E. I. Hall, owning and operating two places of business at Lubbock, Tex. (one known as

Store No. 1 and the other as Store No. 2), up until the dissolution of the partnership on or about November 23, 1926. In May or June, 1926, E. I. Hall came to Waco and had a talk with Mr. Penland of the Waco Drug Company and arranged that his account might run up to $10,000. In the fall of 1926 the account went more than $10,000. The Waco Drug Company was about the only creditor they had then. The account ran up in excess of $11,000. The Waco Drug Company asked for some money. It was not paid like Hall promised to pay. G. H. Penland, the attorney for the Waco Drug Company, came out to Lubbock in October or November, 1926, to see Halsey and Hall about their indebtedness to the Waco Drug Company. After arriving there he found that Halsey was selling his interest in the business to Mr. Benson, one of the defendants, and, accordingly did not call on the drug store on this trip. He later learned that the deal was not consummated, and in November returned to Lubbock. A division of the two stores was made. A corporation was organized called Hall & Benson, Inc., for the purpose of taking over Store No. 1. Store No. 1 was conveyed by M. A. Halsey and E. I. Hall to the new corporation, Hall & Benson, Inc., and the new corporation assumed two-thirds of the total indebtedness of the Halsey-Hall Drug Company. Store No. 2 was conveyed to John Halsey, who assumed one-third of the indebtedness of Halsey Hall Drug Company. That at the time of the dissolution of the partnership of Halsey-Hall Drug Company and the incorporation of Hall & Benson, Inc., for the purpose of dividing the stores, E. I. Hall drew a draft on Duncan Hensley for $10,000, deposited the draft in the Citizens National Bank at Lubbock and delivered a deposit slip to Mr. Penland, the attorney, showing the deposit, and stating to Penland that he had arranged for the money.

E. I. Hall, a brother-in-law of the plaintiff, Duncan Hensley, testified on cross-examination as follows:

"I told you that after you had talked with Mr. Halsey that I would like to talk to you. That night or the next night I had a talk with you there about the conditions of the store; as a matter of fact when you arrived there you found that Mr. Halsey and I were not getting along very well in connection with the operation of the business; we were not working harmoniously in the conduct of the business. The night that I talked with you there in the lobby of the hotel, I asked you something about Mr. Benson coming down and talking to me with reference to buying an interest in the stores. I told you that Mr. Benson had been considering at that time buying Mr. Halsey's interest in the stores. I believe that at the time we were talking there that I told you that he might be inter-

ested, anyway we went to see him, Mr. Benson. After that conversation you and I got in my car early the following morning and went up to Panhandle and had a talk with Mr. Benson about coming down here and taking an interest in the stores with me. At the time that we were talking there with Mr. Benson, I told Mr. Benson that I would try to get some money to put into the stores to relieve the pressing indebtedness. We came back to Lubbock on the same day that we went to Panhandle. The next morning I got in my car and stated that I was going to get the money and that I would be gone until I got it. Mr. Benson, also, said that he was going somewhere too. I stated that I was going to see my sister. When I left here I didn't know where I was going to get the money, but I was going until I got it. I left here on Saturday morning and was gone two days. Something like that, before I came back here to Lubbock. I came back to Lubbock late in the afternoon and I met you in the lobby of the Lubbock Hotel and I told you that I had arranged for the money. You told me there in that conversation that Mr. Benson had phoned down that he would not be interested in acquiring any interest in the two stores. At the time we talked to Mr. Benson there was the proposition of dividing the two stores at that time, he acquiring Halsey's interest in the two stores. At the time we went up to see Mr. Benson, the proposition then was that Mr. Benson would acquire Mr. Halsey's interest in both stores. When I came back and reported that I had my money, and Mr. Benson had phoned down that he was not interested in acquiring any interest in the stores, you told me that it was possible that we might work out a division of the two stores, letting me take one store and Mr. Halsey, or probably his brother, taking the other store. I believe I told you then something to the effect that if a division could be made like that, that I could interest Mr. Benson in coming in with me on a basis of one store. I called Mr. Benson up there over the phone in your room, and told him that I had arranged to get $10,000.00, and that you had suggested or that we had discussed a division of the two stores, and that I had taken over store No. 1 and if he would be interested in coming in with me on that store under that arrangement. Mr. Benson told me over the phone there that he would come down to Lubbock and go into the matter with me."

He further testified:

"It is a fact that after this bill of sale was executed with Mr. Benson and myself that we went over and began operating store #1. We put the sign up in front of the store 'Hall & Benson Inc.' but we didn't get it up until the 15th of December. We did begin to operate it under the name of Hall & Benson Inc.

I believe it is true that we carried advertisements in the paper under the name of Hall & Benson Inc. I think Mr. John W. Halsey went into store #2 along about the 19th of November and operated it under his own name. There was no effort on anybody's part to keep it a secret as to the division of the two stores and they were openly operated here in the city of Lubbock; that is there was no effort on anybody's part that I know of."

Again he says:

My brother-in-law, Duncan Hensley, was in Lubbock sometime the next day. I don't know whether I discussed with him about my operating it under the incorporation of Hall & Benson Inc. or not. I don't remember my brother-in-law asking me any questions at all, nor discussing with me how I was operating the store at all. We were pretty busy when he came in the store. He left that night. My brother-in-law, Duncan Hensley, did not discuss at all the business affairs of the Hall & Benson Inc. He saw me there paying out the money. As to whether or not Mr. Hensley was in the store and saw Mr. Benson and myself there operating the store, will say that Mr. Benson was there. *I did tell him that I had got the money and that I had taken over that store and was paying its creditors.* I was back there in the office and he came back there, but I didn't pay much attention to him. I don't know whether he saw me writing out checks on Hall & Benson Inc. or not. I was writing out checks while he was there."

E. I. Hall further testified on direct examination as to suggestions made to him by C. M. Penland and G. H. Penland as to how he got the money:

"Q. What suggestions did he make to you, if any, with reference to what you do and on what basis, if any, you could raise this money or force Duncan Hensley to pay this money? A. He told me that—

"Q. Did anyone outline to you how you could be instrumental or successful in raising the money on the property or business in these two conversations, and what, if anything, was said by them? A. G. H. Penland outlined it. He told me that I could get the money from Duncan Hensley inasmuch as we had all these assets there and that in the course of a few months we could cut the stock down, and if the stock wouldn't pay for it, that when Benson—in addition to those assets that we had there, the big stock of goods, we could cut that down, and when Benson would pay in his subscription that we would have the money to pay back to Hensley.

"Q. Go ahead and give to the jury anything else that was said, as best you can remember it now, with reference to the raising of this $10,000.00. A. Between the 23rd of November and the 8th or 9th of December.

"Q. Yes, up until you actually got the money.

"Q. State what else was said by G. H. Penland with reference to getting this money that you haven't testified about? A. Mr. Klett, I think I answered the question a while ago. Might add that under the stress of being thrown into bankruptcy, and in addition the threat of criminal procedure, that from the way things looked I got it from Mr. Hensley.

"Q. After these conferences with Mr. G. H. Penland and the statements that he made to you, did you or not make an effort to get the money from Duncan Hensley? A. Yes, sir."

E. I. Hall further testified as follows:

"Q. Go ahead without me having to ask you in detail, and just tell in substance the best you can from memory what, if anything, Mr. Penland said in addition to what you have already testified to, about raising the money for the Halsey-Hall Drug Company. A. Mr. Penland told me that we could raise the money, that I could get it from Duncan Hensley.

"Q. Go ahead and start in and tell in substance as best you can what Mr. Penland stated to you with reference to raising the money out of Duncan Hensley for the Halsey-Hall Drug Company. A. He told me I could get the money and told me how to get it. He told me to tell him about the conditions of the business, about the resources of the thing, and what it was worth, and what it was doing and that we would get the money from him by telling to that effect—

"Q. To what effect? A. To the effect that the business was a going concern, and what the assets were of the two stores that we had there, the Halsey-Hall Drug Company.

"Q. Do you remember his saying anything about the amount of the assets of the Halsey-Hall Drug Company? A. I told him the amount of the assets, included both stores, I made it to him just as pretty as I could, just as nice as I could.

"Q. After this conference or conferences of G. H. Penland with you with reference to getting the money from Duncan Hensley, that you have testified to, state what you then did with reference to taking up the matter with Duncan Hensley, and what you said to him. A. I just told him just exactly what Mr. Penland told me to tell him. Just repeated the conversation to him."

The draft drawn by Hall & Benson, Inc., on Duncan Hensley was not paid by him. Duncan Hensley admitted on cross-examination that Hall had conferred with him before the draft was drawn about getting some money, and testified, in substance, as follows:

"Mr. Hall was down to see me either just before that or after it. At the time he was

down there he talked to me about getting some money. He didn't say he wanted $10,-000.00; just said he wanted some money. *After* that I got this draft drawn by Hall & Benson Inc."

Again he says:

"On the 7th or 8th Mr. Hall called me in regard to some money; he said that they had the two stores here doing business and that they were figuring on re-organizing this business with the intention of Mr. S. M. J. Benson and J. H. Benson coming into the business, and that he wanted $10,000.00. I didn't give them an answer at that particular time. He called me a number of times through the 7th, 8th and 9th. And on the afternoon of the 9th Mr. Halsey called me and asked if I was going to send the money. Mr. Hall's conversation with me was to the effect that they had the two businesses here with assets of $53,000.00 owing $37,000.00 and that the business was increasing and doing a good business and that they were in need of additional capital, that S. M. J. Benson and J. H. Benson were coming into the business later on.

"Q. What business? A. These drug businesses, here, Halsey-Hall Drug business, and that on that basis I would be repaid."

Upon further examination Duncan Hensley testified as follows:

"Q. He had told you they were getting ready for a re-organization in one of his conferences? A. Yes, sir.

"Q. Did you ask him anything about that re-organization? A. Never said anything on my visit here.

"Q. As a matter of fact there was a re-organization for an incorporation of Hall & Benson, Inc? A. Yes sir.

"Q. He had told you that there was going to be a re-organization in one of those conversations? A. Yes sir over the telephone."

He further testified as follows:

"And the next day I came to Lubbock. I arrived here in Lubbock late in the afternoon. I don't remember just what time, four or five o'clock. I did not drive through in the car, came on the train. I went up to store #1. Mr. Hall was there. I don't remember seeing Mr. Benson there, or on that trip at all. I saw Mr. J. H. Benson, I did not see the other Benson. I did not go over to store #2. When I got here the store up there was apparently filled with merchandise. They had a ware room back of the prescription counter that was loaded with merchandise. They were apparently doing a flourishing business there. On December 9th, I did not go over to store #2 at all. I was in and out of the store from time to time. I had another sister here and I spent the morning with her, came back to the store in the afternoon, and spent two or three hours in the store."

"Q. Then the next day when you were in the store, you talked to Mr. Hall? A. Yes sir.

"Q. Did you ever discuss this $10,000.00 that you sent up here? A. No sir, except that he got the money.

"Q. You just asked him if he got the money? A. I don't know that I asked him. Of course, it was conveyed to me that he got the money. He might have said it. I don't remember the conversation exactly."

The foregoing states, in substance, all the material evidence bearing upon the question involved in this suit. From the record it is shown that the Waco Drug Company did not know that E. I. Hall had not perfected his arrangements to get the money from Duncan Hensley at the time he delivered to Penland the deposit slip showing that $10,000 had been placed with the Citizens National Bank of Lubbock. It is further shown that the stores were divided as agreed upon and there was not the slightest concealment of this transaction, because on the same day a circular letter setting forth the entire transaction was sent to each creditor. An analysis of the testimony fails to show that the assets were misrepresented or that Penland told Hall to tell Duncan Hensley that the stores had not been separated. The stores were openly conveyed to the respective parties on November 23d, which was more than two weeks before Duncan Hensley actually paid any money; the respective parties went into possession of the stores; the division of the stores and the change of ownership was immediately made known through advertisements in the newspaper in Lubbock. Duncan Hensley came to Lubbock the next day after he had sent the money to his sister, Mrs. E. I. Hall; did not go into store No. 2; made no investigation of its assets; was there while Hall was sending out checks to the creditors and took the note of Hall personally for the $10,000; and later accepted a deed from Hall to his home place.

■ The Supreme Court, in the case of Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059, 1063, after reviewing the various authorities, lays down the following rule:

"From a careful examination of the cases, it appears (1) that it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony, in legal contemplation, falling short of being 'any evidence'; and (2) that it is the duty of the court to determine whether the testimony has more than that degree of probative force.

"If it so determines, the law presumes that the jury could not 'reasonably infer the existence of the alleged fact,' and 'that there

is no room for ordinary minds to differ as to the conclusion to be drawn from it.' The broad and wise policy of the law, formed in and descending to us through the crucibles of time, does not permit the citizen to be deprived of his property, his liberty, 'or his life upon mere surmise or suspicion, and places upon a trained judiciary the grave responsibility of determining as a question of law whether the testimony establishes more."

The foregoing rule laid down by our Supreme Court has been followed many times by the courts of this state and we cite some of the cases. Texas Loan Agency v. Fannie R. Fleming et al., 92 Tex. 458, 49 S. W. 1039, 44 L. R. A. 279; Nordyke v. Wright (Tex. Civ. App.) 11 S.W.(2d) 385; Wills v. Central Ice & Cold Storage Co., 39 Tex. Civ. App. 493, 88 S. W. 265; Harpold v. Moss (Tex. Civ. App.) 106 S. W. 1131; Missouri, K. & T. R. R. v. Williams (Tex. Civ. App.) 117 S. W. 1043; Dayton v. Stockdale, 54 Tex. Civ. App. 611; 118 S. W. 805; Advance-Rumely Thresher Co. v. Moss (Tex. Civ. App.) 213 S. W. 690; Kirby Lumber Co. v. Boyett (Tex. Civ. App.) 221 S. W. 669; Thomas v. Hawthorne (Tex. Civ. App.) 245 S. W. 966; Houston v. Holmes (Tex. Civ. App.) 262 S. W. 849; Blackwell v. Ship Channel, etc. (Tex. Civ. App.) 264 S. W. 223.

■■ In view of the foregoing testimony, tested by the rule laid down by the Supreme Court in the case of Joske v. Irvine, supra, we are called upon to determine whether the testimony in this case does more than to create a mere surmise or suspicion that the Waco Drug Company was guilty of conspiracy, fraud, concealment, or misrepresentation and that by reason thereof Duncan Hensley parted with his $10,000. It is undisputed that Duncan Hensley and E. I. Hall were brothers-in-law, and that Hall called on Hensley for financial help. Under the circumstances that would be natural. Hall owed the Waco Drug Company more than $10,000 and that company had the legal right to demand payment of its money, and use all legal means to collect it. This record clearly shows that the Waco Drug Company sent its agents and attorney to Lubbock for the purpose, if possible, of collecting the money due it by Hall and Halsey. That the parties were not acting in harmony in the operation of the business, and a dissolution of the partnership was desired, is undisputed. To this end the partnership was dissolved, the business divided, a corporation formed, and means adopted to put the business on a better and sounder financial basis. It shows that the Waco Drug Company, being one of the heaviest creditors, was trying to assist in straightening out the business affairs of the Hall-Halsey Drug Company and collect its money. This it had the clear legal right to do. We do not think from the mere exercise of this right the law will permit the inference to be drawn, unless supported by testimony, that the Waco Drug Company was guilty of conspiracy, fraud, concealment, or misrepresentation and caused Hensley to part with his money. The rule is pointedly and tersely stated in 12 C. J. p. 640: "The evidence must do more than raise a suspicion. It must lead to belief."

It seems that the Court of Civil Appeals rests its judgment for a reversal of this case mainly upon the case of. Oliver et al. v. Huckins et al. (Tex. Civ. App.) 244 S. W. 625, 629. In that case the Court of Civil Appeals, in its opinion, summed up the effect of the testimony involved in that suit as follows:

"The evidence is ample to sustain the finding that the defendants falsely represented the price at which the royalty interest could be bought; that Oliver and Evans were each to subscribe and pay $5,000 interest and McDonald was to subscribe and pay $2,500 interest; and that the wells then in operation on the land under lease were producing from 2,000 to 2,100 barrels daily. The evidence further shows that neither McDonald, Oliver, nor Evans actually paid any money into the enterprise, except the $2,000 which Oliver claimed he and Evans paid for the interest subscribed by Wynn and Duncan. It is further shown by the testimony of defendants themselves that McDonald only paid $17,500 for the assignment of the royalty. The evidence shows that on May 18, 1919, the production in oil of the wells in question was 1,270.64 barrels; that there was a gradual reduction in the production to June 1st, when it was 962.96 barrels; that there was a further and almost continuous reduction to June 16th, when it was 523.24 barrels. Therefore, at the time the defendants made the statements that the wells were producing 2,100 barrels daily, and for some weeks prior thereto and subsequent thereto, the production from the three wells was considerably less than the stated amount, ranging from 1,270.64 barrels on May 18th to 523.24 barrels on June 16th. On several of the days in June the production was considerably less than 400 barrels."

An analysis of the testimony involved in the case of Oliver et al. v. Huckins et al., supra, as compared with the testimony involved in this case, shows, in our opinion, that the two cases are easily distinguishable.

Upon the whole case, we are of the opinion that the probative force of the testimony in this case does not establish a cause of action in favor of the plaintiff against the Waco Drug Company as alleged by him, and therefore, under the principles discussed and authorities above cited, there is not, in our judgment, in legal contemplation, "any evidence" to support his claim for recovery against the Waco Drug Company. To hold otherwise would be unsound and unjust. Accordingly, we are of the opinion that the trial court correctly disposed of the case and that the Court

of Civil Appeals erred in reversing and remanding the judgment of the trial court.

Therefore, for the reasons herein stated, we recommend that the judgment of the Court of Civil Appeals be reversed and that the judgment of the trial court be in all respects affirmed.

CURETON, C. J.

Judgment of the Court of Civil Appeals is reversed, and that of the district court is affirmed, as recommended by the Commission of Appeals.