**CONTINENTAL CAS. CO. v. FOUNTAIN.**

No. 14614.

Court of Civil Appeals of Texas. Dallas.

March 6, 1953.

Rehearing Denied April 3, 1953.

Robertson, Jackson, Payne, Lancaster & Walker and Orrin Miller, all of Dallas, for appellant.

White & Yarborough, Dallas, for appellee.

DIXON, Chief Justice.

This suit was filed by Lottie E. Fountain, plaintiff and surviving widow of James M. Fountain, deceased, against Continental Casualty Company, defendant, on a sickness and accident policy to which was attached a rider covering death benefits in case of death effected solely through accidental means.

Sickness benefits under the policy have already been paid and are not in controversy. Only the death benefit feature is involved in this suit.

The particular provision in the policy covering death benefits is as follows: "This policy provides indemnity for loss of life * * * resulting from bodily injury effected through accidental means * * *. Injury as used in this policy means bodily injury which is the sole cause of the loss which is effected solely through accidental means while this policy is in force."

The case was tried to a jury which returned a verdict in favor of plaintiff, finding (1) that a bodily injury sustained by James M. Fountain on Oct. 7, 1949, was the sole cause of his death on Dec. 3, 1949; (2) that he was not at the time of his death afflicted with cancer; and (3) that $600 was a reasonable attorney's fee. The court rendered judgment for plaintiff for $2,280 based on the jury verdict.

The first three points on appeal relied upon by appellant, who was defendant in the trial court, are all to the effect that there is no evidence to support the jury's verdict. We are therefore required to make a careful analysis of all the testimony.

The record before us shows that on the night of Oct. 7, 1949, the deceased James M. Fountain, accompanied by his wife, Lottie Fountain, appellee, was driving his 1948 Buick from Dallas to Houston. Driving conditions were bad, due to a downpour of rain and the glare of headlights from other cars. Some distance north of Houston deceased allowed the right wheels of his car to slip off the edge of the pavement. In struggling with his steering wheel to pull his car back onto the pavement, his left arm was fractured near the shoulder. He drove on to Houston and early next morning went to Jefferson Davis Hospital where his arm was placed in a cast by a bone specialist. At the end of six weeks, when the time came to remove the cast, deceased employed Dr. Clemmie Johnson who removed the first cast and placed another on the fractured arm. In about a week Dr. Johnson removed the second cast and placed the arm in a sling. About Dec. 1, 1949, deceased entered St. Elizabeth's Hospital in Houston, where on Dec. 3, 1949, he died.

What was the cause of his death? Plaintiff undertook to prove that the death of her husband was effected solely through the accident of Oct. 7, 1949 when his arm was broken while he was struggling to steer his automobile back onto the highway. In order to recover the death benefits it was necessary for her to establish her contention by a preponderance of the evidence. Worley v. International Travelers Assurance Co., Tex.Civ.App., 110 S.W.2d 1202 (wr.dis.).

With the exception of an attorney who testified as to the reasonableness of attorney's fees, the only witness in behalf of plaintiff was the plaintiff herself. Here is a summary of her testimony touching the issue before us: She and deceased were married in 1922 and had lived together as husband and wife from the time of their marriage to his death; he was a minister in the Colored Methodist Church; she was with him on the rainy night in October 1949 when he broke his arm; he had to drive on to Houston, about two hours driving time from the scene of the accident; due to high water they were delayed in getting to Jefferson Davis Hospital until about 1:00 o'clock in the morning; at the hospital a bone specialist put his broken arm in a cast; she didn't know of any other parts of his body that were injured, besides his arm; he suffered from his neck and up into his head; his entire arm from a point near his shoulder to over his hand was covered by the cast; he went home afterward and stayed home for six weeks, during which time he was up and about the house but did not do any work; at the end of six weeks her husband went as an out-patient to St. Elizabeth's Hospital to have the cast removed; a colored woman physician, Dr. Clemmie Johnson, had been employed by her husband and had interceded to get him to St. Elizabeth's Hospital; Dr. Johnson had been practicing a number of years and was the only doctor her husband had hired; Dr. Johnson removed the first cast and placed his arm in a second cast, which remained on him about a week; his arm was then put in a sling; he entered the hospital as a full time patient about December 1, 1949; he was very ill then; she thought perhaps they made a urine test, but they were trying to wait for him to get better to do something for him; he died on December 3, 1949; he never did any work after he was hurt; prior to the accident he appeared to her to be strong and healthy; he was a strong bodied man; he could do more work then most any person; he weighed over 200 pounds; he kept their large yard mowed; dug in flower beds and

helped her with housework; he had never had any serious illnesses or accident before that; prior to the accident she had not heard any complaints out of him about any other portions of his body; he had normal use of his hands and arms; as far as she could tell, there was nothing wrong with his left arm prior to the accident; he would indicate with his hand, by rubbing his neck and head, that he had pain there; upon his request she rubbed his neck and head; he had never done that before the accident; in all the years he had driven a car she had never heard him complain about either of his arms or his neck and head; she and her husband had been paid more than one sickness claim under this same policy; Dr. Johnson saw her husband most every day for about two weeks before his death; she (plaintiff) had not talked to Dr. Johnson about her husband's illness before his death; following his death Dr. Johnson said she thought he had cancer; she (plaintiff) had not talked to any of the other doctors that treated him either at the County Hospital or at St. Elizabeth's and has not attempted to talk to them since her husband's death to determine the cause of his death; Dr. Johnson told her repeatedly before her husband's death that she did not know the cause of his illness; after his death Dr. Johnson said she thought it was cancer.

On behalf of the defendant, there were two witnesses, both of them physicians.

Dr. Clemmie Johnson of Houston, the deceased's own physician, testified by deposition in response to written interrogatories. In substance, this is what she testified: She is a medical doctor, duly licensed to practice in Texas, with an M.D. Degree received in June 1946; practiced in Houston since July 1948; she knew deceased for about three months before his death; attended him as his physician and saw him every day from Nov. 15, 1949 until he died; she first sent him to St. Elizabeth's Hospital to get an X-ray of his arm when it was about time for him to go back to Jefferson Davis Hospital to have the cast removed; he wouldn't go back to Jefferson Davis because he said the internes weren't fair to him; she called in a consultant, Dr. P. W. Beal; they didn't think the cast should be removed because the fracture didn't seem to have healed; to make the patient more comfortable they put a spica cast on him instead of the hanging cast he had been wearing; the X-ray films taken Nov. 15, 1949 were sent to Dr. Harry Fishbein, roentgenologist, who ventured a diagnosis of a pathological fracture and suggested a K.U.B. film, that is, a kidney-urinary-bladder study; the patient returned next day for the K.U.B. film; also a lateral view of the skull; the reports on those films were essentially negative; they showed no evidence of metastatic bone lesion; left kidney was indefinitely outlined, slightly larger than the right; two days later the patient experienced chills and fever; a urinalysis showed infection which responded well to sulfa therapy; in less than a week the patient began to complain of pain in both lower lung fields and of discomfort of the cast; in seven days the spica cast was removed and the arm placed in a sling; he complained of pain in his chest, aggravated by a cough and a productive sputum; the cough was relieved by codeine; the patient became irritable and uncooperative and would not return to the hospital for a chest X-ray or a complete work-up on his case; X-ray of Nov. 22, 1949 still showed osteoporosis in region of humeral shaft; on Nov. 30th, Dr. Johnson brought deceased to the hospital as an out-patient; a chest X-ray was taken, also a recheck of the arm; showed area of destruction of right sixth rib with soft tissue tumefaction extending into the thoracic cage; there was no doubt from the amount of osteoporosis that the patient had a mitotic figure process; the films were taken to Dr. Fishbein; after consultation with him, the family was told that the patient's condition was one of malignancy; it was the wife's desire that her husband be not told; the patient's condition became worse and he was admitted to the hospital on December 2, 1949; he was seen by an urologist, Dr. Leader, for his urinary incontinence, and by Dr. A. Glassman, a bone specialist, for his fracture; further work-up of the case was postponed by the urologist until the lower

urinary tract pathology could be cleared up; he was suffering from acute pyelitis, and that means inflammation of the kidneys; he rapidly weakened and died December 4, 1949; she believed that the patient died from generalized carcinoma, although she did not know what type it was; she had not done a post mortem to determine the site of the squamous cell carcinoma; believed there was a cancer of the kidney; the fracture of the arm being a pathological fracture, there had to be cancer at that site before the fracture; she had no laboratory proof of the type of cancer involved but believed that it was primarily the kidney, so she signed the death report as hypernephroma; she had filled out the death certificate showing the condition directly leading to death as generalized carcinomatosis; the antecedent cause was hypernephroma; she could not say the fracture directly caused the death of the patient; the fracture in her opinion was not the sole cause of his death; she never told plaintiff she didn't know what was wrong with the patient; she didn't tell plaintiff that patient had cancer until there was definite proof as shown in the X-ray of Nov. 30th.

The other witness for defendant was Dr. Leonard Hurt, a Dallas physician. He himself had never seen deceased, James M. Fountain. He explained in laymen's language the meaning of some of the technical terms used in Dr. Johnson's depositions: a "pathological fracture" is a fracture that occurs in a bone that has been previously weakened by some disease, very much the same as a board is broken that has been infiltrated by termites or wood rot; "generalized carcinomatosis" means, in lay terms, a cancer somewhere in the body that has been carried to other parts of the body and there reproduced itself; "osteoporosis" means loss of bone tissue; "hypernephroma" is a malignant tumor of the kidney; "mitotic figure process" is a reference to cancer; "bone metastasis" means that some growth, a cancer or its equivalent, has come from some other part of the body and has started growing in the bone; there are no squama cells in bone tissue, and if a squama cell carcinoma is found in bone tissue, the primary site of the cancer must have originated elsewhere and spread through the blood stream and metastasized itself to the bone structure; from the circumstances described to him in this case, he would not say that the patient's death was caused by the accident; he did not see how the patient's death could have been caused by a simple fracture; it is possible for a man to get an injury to his arm, such a break to his arm, of such a nature that complications might arise which would result in his death; if generalized carcinoma showed up as cancer in kidney, lung and rib, and had metastasized over the bone in the arm, it was an advanced stage of cancer and incurable at that time; it would not have been possible for such a cancer to have commenced after the fracture on Oct. 7, 1949 and advanced to such a stage by Dec. 3, 1949, as to have resulted in the death of James M. Fountain.

The death certificate was signed Dec. 5, 1949, by deceased's physician, Dr. C. E. Johnson. A copy of it, certified by W. D. Carroll, State Registrar, was introduced in evidence. This death certificate gives deceased's age as 54 years and contains the following entries:

"I. Disease or Condition Directly Leading to Death

    (a) Generalized carcinomatosis * *
           Antecedent Causes
             * * *

    (b) Hypernephroma * * *

"II. Other Significant Conditions

(Conditions contributing to the death but not related to the disease or condition causing death)

    (1) Fracture of left arm

    (2) Generalized debility."

The foregoing resume summarizes in substance all the evidence in the record we have been able to find bearing on the question of what caused the death of James M. Fountain.

Plaintiff's own testimony, which plaintiff relied on to make out a case, is at times very indefinite. To illustrate, we quote a few excerpts:

(Direct Examination) "Q. * * * What other parts of his body, if any, were injured, besides his arm? A. I don't know of any.

"Q. Well, do you know whether or not he suffered with other parts of his body following that? A. Yes.

"Q. What parts of his body did he suffer from? A. From his neck and up into his head."

Here are excerpts from plaintiff's testimony pertaining to the question of whether deceased had had any illnesses prior to the accident:

"Q. Lottie, previous to this accident, from the time you married him up until that injury down there on the highway, *had you heard any complaints out of him of any portion of his body?* A. *No, sir.*

"Q. *Other than just a little cold or something like that?* A. *That's all."*

(Cross Examination) "Q. *Lottie, you and your husband have had some other claims for sickness under this Continental Casualty Company policy, have you not?* A. *A few.* (Emphasis supplied.) * * *

"Q. Have you been paid for all those other claims that you made before? A. That's right. * * *

"Q. And it is under this sickness benefit that you have made claims before, is that right? A. For the broken arm and for influenza.

"Q. *You have had other claims before besides the influenza, have you not?* A. *Not that I know of.*

"Q. *You don't know of any other but one claim that you made prior to this?* A. *I don't know how many claims prior to this. A few claims prior to the broken arm.*

"Q. *A few, but more than one?* A. *That's right."* (Emphasis supplied.)

Here are excerpts from plaintiff's testimony on the subject of whether she had talked to Dr. Johnson before and after her husband's death in regard to his illness and the cause of his death:

"Q. Was it you or your husband that hired Dr. Clemmie Johnson? A. Well, yes, it was my husband.

"Q. How many times did she see your husband between the time he hired her and the time of his death? A. Well, most every day she would come in. * *

"Q. *You never did talk to Dr. Johnson about your husband's illness?* A. Before or since?

"Q. Before or since. A. *No, not before.* (Emphasis supplied.)

"Q. Have you talked to her since? A. After his death she talked to me.

"Q. She at that time told you that your husband had carcinoma, didn't she? A. After his death?

"Q. Yes. A. What is that?

"Q. Cancer. A. Cancer. She thought it was cancer.

"Q. Well you have discussed the statement that she put on the death certificate with her, have you not? A. No, I didn't discuss it with her. She told me she thought it was cancer." (Redirect)

"Q. Lottie, you have been asked if Dr. Johnson told you he died from cancer and you said she told you that she thought he did. When did she tell you that? While he was sick or after he died? A. After his death.

"Q. *And while he was sick what did she tell you about it?* A. *She told me she didn't know. * * * A. She repeatedly told me that she did not know what was wrong with the patient. * * *."* (Emphasis supplied.)

The statutes of the State of Texas with reference to death certificates expressly provide that "any such copy of the record * * *, when properly certified by the State Registrar, shall be prima facie evidence in all courts and places of the facts therein stated." Art. 4477, Rule 54a, Vernon's Ann.Civ.St. The death certificate in this case, duly certified by the State Registrar, recites that the disease or condition directly leading to death was generalized carcinomatosis, that is, cancer. Thus at the very outset we are confronted with a situation wherein the defendant has introduced evidence that as a matter of law establishes a defense of death due to cancer, unless it is rebut-

344

ted by plaintiff's evidence. Clark v. Hiles, 67 Tex. 141, 2 S.W. 356; Thornell v. Missouri State Life Ins. Co., Tex.Com. App., 249 S.W. 203. We find no evidence in the record to the effect that cancer was not the cause of the death of plaintiff's husband.

◼ We believe that the case of Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, 1063, lays down the rule applicable to this case: "* * * it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony, in legal contemplation, falling short of being 'any evidence'; * * *." See also Waco Drug Co. v. Hensley, Tex.Com.App., 34 S.W.2d 832.

The case of Worley v. International Travelers Assurance Co., supra, involved an insurance policy like the one now before us, providing for death benefits if death be caused from bodily injury effected solely through accidental means. The deceased had fallen down some cellar stairs and injured his head and other portions of his body. About three months later while in the hospital he engaged in a violent scuffle with two hospital attendants in which he was thrown or fell to the floor. Eight days later he died. Medical testimony showed that prior to his death deceased was afflicted with cirrhosis of the liver and syphilis for which he had been treated. There was also expert medical testimony that injuries such as those accidentally sustained by deceased could cause death. Space will not permit of a more detailed analysis of the evidence in the Worley case. The trial court sustained defendant's motion to withdraw the case from the jury and rendered judgment for defendant. In affirming the judgment, the Fort Worth Court of Civil Appeals, quoting our Supreme Court in Galveston, H. & S. A. Ry. Co. v. Powers, 101 Tex. 161, 105 S.W. 491, said: "It was not proven nor was the issue raised by showing that death could result from a fall such as that received by the insured, nor that it was possible for such a fall to pro-

duce death. 'Neither expert witnesses nor the jurors may be turned loose in the domain of conjecture as to what may by possibility ensue from a given statement of facts. * * * '" [110 S.W.2d 1205.] See also American National Ins. Co. v. Briggs, Tex.Civ.App., 70 S.W.2d 491; Maryland Casualty Co. v. Glass, 29 Tex.Civ.App. 159, 67 S.W. 1062; and Robinson v. Aetna Life Ins. Co., Tex.Com. App., 276 S.W. 900.

◼ It will be observed that nowhere in the record is there any direct testimony that the accident was the sole cause of the death of James M. Fountain. We are mindful that the cause of death may sometimes be inferred from circumstances. However in the case at bar in order to reach any such conclusion we must base an inference upon an inference. We must (1) infer from the direct testimony that at the time of the accident on Oct. 7, 1949, deceased was a strong healthy man. But we cannot stop there. We must go further and (2) infer that since he was a strong healthy man when the accident occurred, it follows that the accident must have been the sole cause of his death. This process of piling one inference upon another is not permitted under the law. Wells v. Texas Pac. Coal & Oil Co., 140 Tex. 2, 164 S.W.2d 660; American Casualty & Life Co. v. Morrison, Tex.Civ. App., 161 S.W.2d 796; Brown v. Maryland Casualty Co., 8 Cir., 55 F.2d 159.

American Casualty & Life Co. v. Morrison, supra, was a case in which, like the one before us now, the burden was on the plaintiff to prove that insured's death resulted from purely accidental means. Judgment was rendered for the plaintiff on a jury verdict. The Court of Civil Appeals in reversing and rendering the trial court's judgment, said [161 S.W.2d 797]:

"* * * it would be necessary to further presume that her falling was not due to sickness or ill health. Even then, it would be necessary to indulge a further presumption that she died solely as the result of an injury received from the fall. As said in the authority first cited [International Travelers Ass'n v. Bettis,

120 Tex. 67, 35 S.W.2d 1040]: 'Neither the pleadings nor the proof ·can be left open to conjecture and guesswork. A presumption of a fact cannot rest upon a fact presumed.' "

Brown v. Maryland Casualty ·Co., supra, was also a case in which the burden was ·on the beneficiary to prove insured's death resulted solely from accidental means. Plaintiff claimed that injuries sustained when he was violently pushed down in bed were the sole cause of deceased's death. The court directed a verdict for defendant. In affirming the judgment the Circuit ·Court of Appeals said [55 F.2d 161]:

"The burden of proof was upon her. True, she was entitled to such favorable inferences as reasonable men might fairly draw from the testimony, but such inferences must be based upon facts and not upon other inferences. * * * nor can a jury be permitted to base a verdict upon mere guess or surmise."

Plaintiff points out that defendant failed to produce testimony from doctors in Houston who were consulted by Dr. Johnson. Defendant did produce the testimony of deceased's own physician, Dr. Johnson, who testified that deceased had cancer, and that in her opinion the fracture was not the sole cause of his death. Also, defendant put in evidence the death certificate, duly certified by the State Registrar, which as a matter of law, was prima facie evidence that generalized carcinomatosis (cancer) was the disease or condition directly leading to death. This was further in the way of producing evidence than defendant was under any duty to go. The burden was on plaintiff to prove by a preponderance of the evidence that the death of James M. Fountain was effected solely by accidental means; the burden was not on defendant to disprove any part of plaintiff's case. Universal Life & Accident Co. v. Beaty, Tex.Civ.App., 177 S.W.2d 244; Layton v. Metropolitan Life Ins. Co., Mo. App., 89 S.W.2d 576.

Plaintiff cites Coxson v. Atlanta Life Ins. Co., 142 Tex. 544, 179 S.W.2d 943, by ·our Supreme Court, to support her contention that the judgment of the trial court should be affirmed. We do not consider that case in point. In the Coxson case the ultimate fact issue was whether the insured was in good health at the time he applied for and obtained a policy of life insurance. Testimony of lay witnesses was held to be sufficient to support a jury verdict notwithstanding medical testimony to the contrary. As already pointed out, in the case before us the state of health of deceased at the time of the accident is merely the first inference we are asked to make before going on to conclude by way of a second inference that the accident was the sole cause of deceased's death. Even if we say that the evidence here is sufficient to support a finding that Fountain was strong and healthy on Oct. 7, 1949, we must say that it is wanting in probative force to show the cause of his death about two months later. In fact, it is almost inconceivable that the injuries he received in the accident could have caused the death of a strong, robust, healthy man.

Plaintiff also cites Pledger v. Business Men's Accident Ass'n, etc., Tex.Com.App., 228 S.W. 110, 113. At first glance that case might seem to hold that certain evidence was sufficient to support a finding of death exclusively by accidental means, for the syllabus No. 1 is not entirely clear. However, the syllabus, if it can be so interpreted, is inaccurate. What the court really holds is that the case should be decided on the basis of a clause in the policy which provides for payment of death benefits in case of accidental death—which provision did not require that accidental death should have been the sole cause of the death. The trial court had erroneously applied a provision in the by-laws of the Association which awarded death benefits only if death were caused exclusively by accidental means. The court points out that the phrase "accidental death" as used in the policy, and the phrase "death resulting from accidental means" as used in the bylaws, have different meanings. The court said:

"A fair construction of the plain provisions of the contract of insurance, * * * leads to the conclusion that the contingency insured against was accidental death, rather than death caused by accidental means."

■ Defendant's fourth point on appeal is that plaintiff's attorney was guilty of improper argument to the jury in that he informed the jury of the effect of their answer to Special Issue No. 1. It is shown in a bill of exception that plaintiff's counsel picked up the insurance policy, which was in evidence, and read to the jury the definition of injury, which is copied in the third paragraph of this opinion. Then plaintiff's attorney said, "It's got to be that way." Apparently the attorney was discussing a document which had been introduced in evidence and was a fair subject of comment. We overrule defendant's point as to improper argument. Russell v. Martin, 121 Tex. 488, 49 S.W. 2d 699; Commercial Standard Ins. Co. v. Shudde, Tex.Civ.App., 76 S.W.2d 561.

■ Because we believe the evidence in the record fails as a matter of law to support the jury verdict and the judgment of the court based thereon, the judgment of the trial court will be reversed and judgment rendered for defendant that plaintiff take nothing.

Reversed and rendered.

### On Rehearing.

In her motion for rehearing plaintiff complains of the statement in our opinion that the next morning after his injury, James M. Fountain's arm "was placed in a cast by a bone specialist." It was plaintiff herself who so testified. Her testimony to that effect will be found in the Statement of Facts, page 12, lines 23 and 24.

Plaintiff also complains of our statement that "Dr. Johnson had been practicing a number of years." Again, we were relying on plaintiff's own testimony as shown in the Statement of Facts, page 14, lines 19–21. Dr. Johnson herself testified that she graduated from medical school June 24, 1946, and had practiced in Houston, Texas since July 1948. The record does not indicate whether she had practiced elsewhere than in Houston.

Plaintiff further complains of the following statement in our opinion: "The X-ray films taken Nov. 15, 1949 were sent to Dr. Harry Fishbein, roentgenologist, who ventured a diagnosis of a pathological fracture and suggested a K.U.B. film, that is, a kidney-urinary-bladder study." Plaintiff says that Dr. Johnson testified as to what Dr. Fishbein told her over plaintiff's objection that such testimony was hearsay. We find no record of any such objection in the record. Nor does plaintiff in her brief cross-assign the court's adverse ruling. The record does show that the trial court sustained plaintiff's exceptions 1, 2, 3, and 5, to the deposition, but these exceptions are not copied in the record; so there is no way for us to know which of the answers were attacked. Anyway, the error, if it was error, was harmless for it neither added to nor took away from the plaintiff's burden to make out a case. The testimony was offered by defendant seeking to prove that deceased died of cancer. It was not necessary for defendant to offer any such testimony. It may be disregarded without affecting plaintiff's burden to show that the injuries sustained Oct. 7, 1949 were the cause of Fountain's death.

■ Another of plaintiff's points on rehearing is that Dr. Johnson's testimony in which she gave her opinion as to what caused Fountain's death, was also hearsay. We do not agree, but if we are wrong, the error was harmless for the reasons above stated. We repeat that the burden was not on defendant to disprove any part of plaintiff's case.

We have studied the statement of facts in this case very carefully and we find no reason to believe that if we remand the cause plaintiff's case will be more fully developed. Plaintiff is not satisfied with Dr. Clemmie Johnson's testimony that deceased had cancer. In her motion for rehearing she says that the point should be more fully developed by obtaining the testimony of other Houston doctors. An issue was submitted to the jury as to whether deceased was afflicted with cancer at the time of his death. The answer of the jury was favorable to plaintiff. Consequently her case will not be helped by a further development of the point. We did not reverse the trial court's judgment on the ground that deceased did or did not have cancer. We reversed the case because there was no evi-

dence that the death of James M. Fountain was effected solely through accidental means—that is, solely as a result of the injuries sustained in the accident of Oct. 7, 1949. That was plaintiff's burden. She would not be relieved of that burden even if the Houston doctors testified favorably to her on defendant's claim of cancer.

All other points in plaintiff's motion for rehearing have been considered and are overruled.

Motion for rehearing overruled.