PRAETORIAN MUTUAL LIFE INSURANCE COMPANY, Appellant,

v.

Maurine HUMPHRYS and Clint P. Humphrys, Independent Executors of Estate of Dr. France Austin McKee, Jr., Appellees.

No. 17330.

Court of Civil Appeals of Texas, Fort Worth.

June 30, 1972.

Rehearing Denied Sept. 15, 1972.

Bowyer, Thomas & Sweet, H. T. Bowyer and William W. Sweet, Jr., Dallas, for appellant.

Garrett, Settle & Callaway and Rufus S. Garrett, Jr., Fort Worth, for appellees.

OPINION

MASSEY, Chief Justice.

The executors of the estate of the deceased, Dr. France Austin McKee, brought suit against the Praetorian Mutual Life Insurance Company to collect the additional accidental death benefits provided by certain of its insurance policies in the event death was in consequence of bodily injuries effected through accidental means, etc. We will treat the insurance in question as though by an individual policy,

though there were several, the contractual provisions being common to all.

Judgment was for the executors, based upon a jury verdict, and the insurance company appealed.

We reverse and render.

■ We examine and discuss the circumstances and events important to the case. We will disregard the evidence in favor of the insurance company where there is contradictory evidence in favor of the plaintiffs. We will not, however, disregard evidence in favor of the insurance company which is not in dispute. None of it was by an interested party. Cochran v. Wool Growers Central Storage Co., 140 Tex. 184, 166 S.W.2d 904 (1943) and cases following; McDonald, Texas Civil Practice, Sec. 11.-28.6 "—Testimony of Interested Party or Witness. (a) Use for."

On the evening of March 5, 1970, a Miss Madden had been visiting with Dr. McKee, the deceased, in his home in Fort Worth, Texas. During the course of the evening they left the premises in a locked and undisturbed condition to visit friends in another part of the city. Upon leaving the home of such friends after such visit they arrived back at the home of Dr. McKee at approximately 1:00 o'clock A. M. They alighted from the automobile and entered the house by way of a sliding glass door to Dr. McKee's bedroom which opened upon a "floodlighted" patio, Dr. McKee entering first.

The intent had been to enter the door to the den of the home, but Miss Madden happened to notice that the glass at the door handle on the bedroom door nearby had been broken. She called this to the attention of Dr. McKee. Remarking that it looked like there had been a forced entry Dr. McKee slid the bedroom door open, parted the drapes immediately inside and stepped into the room followed by Miss Madden. The room was in disarray, with the mattress pulled off the bed, linen on the floor, and with clothing about which had evidently been removed from the closet and from dresser drawers. The lights were on. Dr. McKee exclaimed, "Oh, my God, they have been here again", and then addressed Miss Madden, as follows: "You wait here outside, and let me go get my gun." Miss Madden did not leave the room, but remained at the door. From where she was standing she could see Dr. McKee as he walked out of the room and into and down the hallway leading from the room toward another bedroom further to the front portion of the house. He was "picking his way" in that he was obliged to step over items on the floor, having been pulled out of a closet opening into the hallway. In the direction he was going Dr. McKee would have come directly into the front entrance hall, into which both the living room and den opened. The hallway was only indirectly lighted, by reflected light from the bedroom and the office. Miss Madden saw him clearly until he took a right turn, which if completed would have led him into the front entrance hall.

At that point Dr. McKee passed out of the view of Miss Madden, but almost immediately she saw both his hands come back into view as though thrown back over his shoulders. The hands, but not the body of Dr. McKee were in her view. Immediately his hands went forward and out of sight of the witness, after which she could see no part of him. It was explained that the aforedescribed motion of Dr. McKee's hands was one of his characteristics, an automatic motion indicating surprise often made upon an unexpected encounter of someone, as in the corridors of the hospital. The witness heard no sound. A split second after his hands went forward she heard a scream, which she thought to be that of Dr. McKee but not positively identified. The scream was of ten to twelve seconds duration, prolonged and continuous and going from a lower to a higher pitch, dying into an eventual guttural sound. She heard no other sound. Specifically, she did not hear any noise such as one made by a blunt instrument striking someone on the head.

The witness further testified that at the termination of the guttural sound there was absolute silence for "just a second it seemed like—a very short period of time. And then I heard a shot". Thereafter, for a few moments there was absolute silence. Miss Madden ran across the bedroom to the door to a bathroom. She entered the bathroom and attempted to conceal herself therein. She had barely closed the bathroom door when she heard a man's voice coming from the direction of the hallway down which Dr. McKee had proceeded. This person said, "God damn it; hurry up; let's get out of here; we don't have much time; I have it; God damn it, let's go." Afterward she heard nothing. She remained in the bathroom for approximately eleven minutes. Then she left the bathroom, leaving the room by way of the glass door through which she had entered and going to the home of a neighbor where the police were called.

Shortly after having made the call three policemen appeared at the house from which Miss Madden had made the call. She accompanied them to Dr. McKee's home, entering through the same glass door to the bedroom, thence down the hallway in the path traveled by Dr. McKee. She saw the body of Dr. McKee. The body was lying on its back in the den just off the entrance hallway with the feet toward the entrance hallway and extending into the entrance hallway. The point where Miss Madden described the location of the body (as maybe a foot into the den from the entrance hall) was described by her as only three or four feet from where the body of Dr. McKee would have been when she last saw his hands make the motion described by her as characteristic of him when suddenly surprised.

A pistol, the discharge of a bullet from which had struck and killed Dr. McKee, was later found discarded in a different part of the city. It had been removed from the McKee home on the night of his death by person or persons not identified during course of the trial.

The injury to Dr. McKee which caused his death was the coursing through his body of a projectile or bullet from that gun. The entrance of the bullet was approximately four (4) inches below Dr. McKee's right arm-pit toward the back—in the right posterior axillary line—through the space between the third and fourth rib. If took a course penetrating the right lobe of the lungs toward the central part of the chest, entering the right upper side of the heart. Then it exited the heart through the left side of the left ventricle, through the left lobe of the lungs exiting the chest in the space between the third and fourth ribs in the mid axillary line at the level of the left nipple. The muzzle of the gun had been either in contact with or in close proximity to the body when it emitted its fatal discharge. The conclusion of the official medical examiner was that death was the result of homicide.

In addition to the aforesaid injury, but not an injury which was the cause of death, there was a deep laceration in the right frontal region (right forehead) about three (3) inches above the right eye-brow approximately one-half inch in diameter, under which there was a slight abrasion of the bone, but no fracture of the bone itself. Additionally, on the left ear and frontal area surrounding the left ear there was a small laceration, and over the left corner of the upper lid there was another small laceration. The record is completely silent as to whether any of these injuries did or could have rendered Dr. McKee unconscious, or as to whether they were experienced before or after the fatal gunshot wound. They did not produce injury to the brain.

There is no evidence indicative of the place where Dr. McKee kept the pistol by discharge of which his death ensued, of where he expected to find it, or even whether it was the particular weapon of which he was in search. There is no evidence as to whether he even obtained this or any other weapon prior to the time of its fatal discharge. However, had he ob-

tained this weapon so that he had it in one of his own hands when the witness observed the motion of his hands over his shoulders, indicating surprise on his part, the plaintiffs did not so show by cross-examination. To conclude that it was in his own hands, or perhaps falling therefrom at time of its discharge would require resort to pure fantasy and speculation.

Except for proof of the insurance policy provisions, that it was in full force and effect at the material time, that Dr. McKee's death was in consequence of a gunshot wound in the heart and lungs (together with evidence of a severe blow to the head by a blunt instrument), and proof as to reasonable attorney's fees, plaintiffs introduced no direct evidence. They contented themselves with cross-examination of witnesses called by the insurance company. In brief the plaintiffs contented themselves with a trial prosecuted on the theory that the burden of proof was on the insurance company on the whole case, including the single special issue submitting the question of liability. Their insistence was that they were entitled to prevail on the theory of the initial legal presumption against death from other than accidental means established by mere proof that Dr. McKee died as result of a gunshot wound; that in view of the presumption it was incumbent upon the insurance company to win its case and not their duty to win their case against the company.

In this the plaintiffs erred. The presumption upon which they relied "disappeared like chaff in the wind" upon the introduction of the company's evidence contradictory of the applicable legal presumption. Thereafter such presumption, previously existent, no longer constituted evidence. In short plaintiffs failed to prove a *prima facie* case or refused to attempt to do so in the hope or belief that such was not their duty.

■ By the policy in question, relative to its "accidental means" death benefits, was provided: "This Additional Accidental Death Benefit shall not be payable if it appears that such death resulted, directly or indirectly, wholly or in part, from any of the following causes: . . . (5) injury intentionally inflicted by another person; . . . ." On construction to be given the exclusion see National Life and Accident Insurance Co. v. Knapp, 430 S.W.2d 84 (Houston (14th Dist.) Tex.Civ.App., 1968, writ ref., n. r. e.). This policy provision was specially plead by the insurance company as an affirmative defense in compliance with the provisions of Texas Rules of Civil Procedure 94, "Affirmative Defenses". In consequence of pleading the exception to general liability upon the insurance policy the question of injury intentionally inflicted by another person was raised as an issue in the case, with the plaintiffs thereby having cast upon them the same burden upon properly raised issues as would have been the case prior to the adoption of the Rule. See Commentaries under the Rule by the Subcommittee on Interpretation of Rules, under heading "Actions on insurance contracts". In such an instance, when such an exception is plead defensively, a plaintiff must prove that the facts upon which he relies for recovery did not come within the exception. Shaver v. National Title & Abstract Co., 361 S.W.2d 867, 98 A.L.R.2d 531 (Tex.Sup., 1962).

■ Furthermore, the policy was one where the applicable insurance applied to "bodily injuries effected solely through external, violent and accidental means, . . . ." By such insurance provisions, denominated an "accidental means" policy as distinguished from an "accident" policy, is foreclosed any right on the part of a court to determine whether there was an accident merely from the standpoint of the person insured by the policy and, in accord with the language by which the parties had contracted, must determine whether there was an accident in the causation of the means by which the injury resulted. International Travelers' Ass'n v. Bettis, 120 Tex. 67, 35 S.W.2d 1040 (1931). As ap-

plied to the circumstances of the instant case that would mean from the standpoint of the person who set in motion the physical activity proximately causing the discharge of the bullet from the pistol of Dr. McKee into his body so that his death was a direct consequence. Of course, in view of the language of the policy contract, in the event it was another person who set such in motion the exclusion would only be applicable in the event the activity was intended, coupled with the intent that Dr. McKee should thereby sustain injury in some degree.

On a policy such as this the beneficiary, in order to recover the accidental death benefits, must establish and obtain a factual finding of the negative of the company's allegations that death was due to a risk falling within the exceptions of the policy of insurance. We had the question before us, more particularly in regard to the proper placement of the burden on the special issues, in Golden State Mutual Life Insurance Co. v. Summers, 301 S.W. 2d 491 (Fort Worth, Tex.Civ.App., 1957, no writ hist.). So holding we cited as authority Continental Cas. Co. v. Fountain, 257 S.W.2d 338 (Dallas, Tex.Civ.App., 1953, error refused). *Fountain,* so holding, cited as authority the case of Worley v. International Travelers Assur. Co., 110 S. W.2d 1202 (Fort Worth, Tex.Civ.App., 1937, writ dism.), in which there is excellent discussion.

Since the plaintiffs in the instant case were required by law to establish such negative, it follows that they must carry the burden on the special issue by which the jury settles the controversy. Since the trial court placed this burden on the defendant company by the special issue submitted to the jury reversible error appears. See 32 Tex.Jur.2d, p. 774, et seq., "Insurance", Sec. 529, "Excepted risks". That such has long been the settled law in Texas is apparent from International Travelers' Ass'n v. Bettis, 120 Tex. 67, 35 S.W. 2d 1040 (1931); International Travelers

Ass'n v. Marshall, 131 Tex. 258, 114 S.W.2d 851 (1938); and Sherman v. Provident American Insurance Company, 421 S.W. 2d 652 (Tex.Sup., 1967). See also cases under 22A Tex.Digest, "Insurance", ☞ 645(2) "Matters to be proved", and Vol. 22, ☞467.1(1) "Presumptions and burden of proof".

Furthermore, from the evidence adduced upon trial our conclusion is that—even if we should assume that the jury had found by a proper special issue (by which the burden was properly placed on the plaintiffs) the *negative* of the company's allegations,—i. e., had affirmatively found that the death of Dr. McKee *did not* result from an injury intentionally inflicted by another person,—it would nevertheless be necessary to disregard the finding so assumed. There would be a necessity to disregard such because there was no evidence of probative force and effect to raise it as an issue for submission to the jury. For an answer to be thus returned to even a correct special issue the jury would necessarily be required to resort to pure fantasy and speculation to conclude that the deceased died as the result of a gunshot wound accidentally inflicted or, in this particular case, that the gunshot wound *was not* intentionally inflicted by another. In the general case, as in this particular case, where the finding would necessarily require resort to fantasy and speculation an adverse judgment would be the only possible proper judgment.

That the foregoing presents the law controlling the case is apparent from the opinion in Combined American Insurance Company v. Blanton, 353 S.W.2d 847 (Tex. Sup., 1962). That was a case where one presumed fact finding upon which the trial court's judgment for recovery was rendered (under an "accidental means" policy) was on the theory that the company's evidence did not overcome the legal presumption of accidental death. Another presumed fact finding was that the decedent's death was effected exclusively of all other causes by accidental means. The insur-

ance company contended that it was entitled to a judgment as a matter of law in that the aforementioned presumption of accidental death had been overcome by the company's evidence, and furthermore because the undisputed facts demonstrated suicide as a matter of law. The Supreme Court stated that in such a case the legal presumption, in that instance amounting to a presumption against suicide, has the effect of imposing on the party against whom it operates the burden of producing contradictory evidence. The holding was that such burden was discharged by the insurance company by its introduction of evidence of facts consistent with suicide; that thereupon the legal presumption ceased to exist as though it had never been, whereby the presumption was not to be weighed or treated as evidence for any purpose from the time it was rebutted.

In the instant case the initial presumption would be substantially identical, to wit: that Dr. McKee's death was effected, exclusively of all other causes, by accidental means. Specifically, as applied to the case, the presumption which placed on the company against whom it operated the burden of producing contradictory evidence was the presumption that death was accidental and that no other person had intentionally shot Dr. McKee, thereby inflicting the injury causing death. 32 Tex.Jur.2d, p. 790, "Insurance", Sec. 536, "Presumptions as to nature of act causing death". There would be no distinction to be made between the instant case and *Blanton* merely because in such other case the presumption involved suicide, i. e., the intentional infliction of fatal injuries upon one's self. As in *Blanton* the legal presumption initially operative in plaintiffs' favor was "blown away like chaff in the wind" by the company's introduction of evidence in rebuttal, leaving no evidence which would support a reasonable inference that Dr. McKee's death was caused by accidental means.

In consequence of the company's introduction of contradictory rebuttal evidence the burden of proof devolved upon the plaintiffs to establish by a preponderance of the evidence, wholly apart from and without dependence upon what had been the initial legal presumption that Dr. McKee's death was within the terms of the policy. Specifically, we refer to the initial legal presumption that his death had resulted "from bodily injuries effected solely through external, violent and accidental means"; or, in view of the express defensive pleading of the company, that such death did *not* result from an "injury intentionally inflicted by another person". Our holding is that plaintiffs did not prove such negative by evidence sufficient to raise the proper special issue, and hence failed to make out the *prima facie* case requisite to any judgment in their behalf.

Since the case was tried by plaintiffs on an erroneous theory, concurred in by the trial court, and since there is a possibility that they did not fully develop their evidence in view thereof, we have considered the propriety of a remand incident to reversal rather that the rendition of a judgment against them. By reference to their briefs, however, it is observed that they nowhere intimate that their case has not been fully developed or that any evidence not presented on trial would be available in the event they might have erred by the theory upon which they insisted their case be tried. To direct a remand under these circumstances would appear improper in that to do so would merely afford plaintiffs an opportunity for another "bite at the apple." Jackson v. Ewton, 411 S.W.2d 715 (Tex.Sup., 1967); National Life and Accident Insurance Co. v. Blagg, 438 S.W.2d 905 (Tex.Sup., 1969); City of Fort Worth v. Pippen, 439 S.W.2d 660 (Tex.Sup., 1969); Owen v. Brown, 447 S.W.2d 883 (Tex.Sup., 1969); and T.R.C.P. 434, "If Judgment Reversed".

Judgment is reversed. Judgment is rendered that Maurine Humphrys and Clint P. Humphrys, Independent Executors of the Estate of Dr. France Austin McKee, Jr., take nothing by their suit against Praetorian Mutual Life Insurance Company.